HENRY V. CUNNINGHAM, trustee, *vs.* COMMISSIONER OF BANKS & another.

SAME *vs.* SAME.

SAME *vs.* SAME.

Suffolk.    March 17, 1924. — June 4, 1924.

Present: RUGG, C.J., BRALEY, CROSBY, CARROLL, & WAIT, JJ.

*Trust Company,* In liquidation: no right of commissioner of banks to set-off claim founded on participation by trust company in fraudulent transaction of creditor; Shareholder: new issue of stock, statutory liability; Director's liability. *Bankruptcy,* Preference, Renunciation by trustee of worthless property. *Set-off. Fraud. Equity Jurisdiction,* Equitable set-off. *Commissioner of Corporations. Secretary of the Commonwealth. Evidence,* Presumptions and burden of proof. *Estoppel. Words,* " Provable."

While, under § 68 of the national bankruptcy act, a trust company may set off the amount of deposits of one of its customers against the amount due to it on debts of such customer at the moment when such customer goes into bankruptcy provided the deposits were not made with a view to such set-off with notice of such bankruptcy, the commissioner of banks, in a suit in equity by a trustee in bankruptcy of one, who before his bankruptcy was a depositor in a trust company, against the commissioner in possession of the property and business of the trust company, to establish a claim based on a .certificate of deposit for which value had been given, is not entitled to set off against the amount of the certificate the amount of an overdraft by the bankrupt which the trust company had permitted when its officers knew that the customer was a bankrupt and was engaged in a fraudulent business.

The permitting by a trust company of an overdraft by a depositor, whom its officers knew to be a hopeless bankrupt and to be engaged in a fraudulent business, where the trust company relied for security upon an assignment to it of a certificate of deposit which it previously had issued to the depositor for value, is the equivalent of a loan to the depositor of the amount of the overdraft; and, where it appears that the officers of the trust company knew that the money procured by such overdraft was to be and was used by the bankrupt to prefer some of his creditors over others who thereby were deprived of the benefits of the bankruptcy act, the commissioner of banks, in a suit by the trustee in bankruptcy of the bankrupt against him while in possession of the property and business of the trust company to enforce proof of a claim based on the certificate of deposit, will not be permitted to enforce recognition of the security given for the repayment of such overdraft.

The fact, that, in the suit above described, a master found that there was no collusion between the trust company and the creditors of the bankrupt who secured a preference through the overdraft, does not warrant a set-off of the overdraft against the amount due on the certificate of deposit.

The circumstance that the commissioner of banks was liquidating the trust company for the benefit of its creditors placed him in no better position with respect to the transactions above described than was the trust company itself.

In the suit in equity above described, *it was ordered* that the trustee in bankruptcy should be permitted to establish the claim based on the certificate of deposit for its full face value with interest from its date to the date when the commissioner of banks took possession of the property and business of the trust company.

In the suit in equity above described, the commissioner filed a cross bill to establish liability of the bankrupt as a stockholder and director of the trust company. It appeared that, about two months before the filing of his involuntary petition in bankruptcy, the bankrupt became the owner of certificates for seventy-five shares of stock in the trust company which were indorsed in blank by the previous owners, and that there had been no transfer of the shares on the books of the trust company; that the by-laws of the trust company provided that no voluntary transfer of shares of stock should be valid to pass title except after permission by the executive committee or an offer under stated conditions to the directors; that a few days later and before his bankruptcy, the bankrupt was elected and sworn in as a director of the trust company; that a week later he purchased for cash one thousand five hundred shares of stock of the trust company which were a part of a new issue of two thousand shares purporting to be authorized by vote of the stockholders in due form; that the bank commissioner had approved of this new issue; that no articles of amendment were prepared and submitted to the commissioner of corporations or filed with the secretary of the Commonwealth pursuant to the provisions of St. 1903, c. 437, §§ 41, 42; that certificates for the one thousand five hundred shares had been delivered to the bankrupt, two hundred of which were held in his own name and the remainder in the names of nominees of

his, the beneficial interest in all remaining in him, and that he had kept possession of the certificates. *Held,* that

(1) The circumstances disclosed prevented the bankrupt and his trustee in bankruptcy from disputing that he was a holder of one thousand five hundred seventy-five shares of the capital stock of the trust company;

(2) The bankrupt was one of the board of directors and a member of the executive committee of the trust company with all the obligations thereby implied;

(3) Without minimizing in any degree the importance of compliance with St. 1903, c. 437, §§ 41, 42 (now G. L. c. 156, §§ 43, 44), failure to comply therewith in the circumstances above disclosed did not affect the rights and liabilities of the stockholder and the corporation as to each other;

(4) The fact, that the certificates for the seventy-five shares of the original issue of stock were suffered by the bankrupt to remain on the books of the trust company in the names of the original holders, did not affect the bankrupt's liability even though that of the original holders might continue.

A determination by the commissioner of banks, in possession of the property and business of a trust company for the purpose of liquidation, to enforce stockholders' liability is valid even though it was made before the recovery of judgment by a creditor against the corporation and the occurrence of the other conditions precedent to the maintenance of proceedings to enforce such liability, set out in G. L. c. 172, § 24; c. 158, §§ 46, 49.

Sixty-five of the seventy-five shares of stock originally procured by the bankrupt in the circumstances above described were inventoried as part of the estate of the bankrupt. There was no allegation by the trustee in bankruptcy renouncing title to those shares. The trial on the cross bill above described proceeded before a master on the issues raised by the pleadings and the one reference in his report to a refusal by the trustee to accept the property was a letter from the trustee of the bankrupt to the liquidating agent of the trust company, dated over a year after the adjudication of the bankruptcy and over a year and a quarter after the commissioner of banks had taken possession of the property and business of the trust company, in which the writer stated, in substance, that the shares of the new issue were illegal and that, as to the other shares, the principle of onerous property might be relied on. *Held,* that

(1) A right of a trustee in bankruptcy to refuse to accept title to property of the bankrupt if in his opinion it is worthless or likely to be a burden rather than a benefit, must be exercised within a reasonable time;

(2) It was too late for the trustee to raise such a defence;

(3) The defence was incompatible with the trustee's previous conduct.

An involuntary petition in bankruptcy in the circumstances above described was filed on August 9, 1920. The commissioner took possession of the property and business of the trust company on August 11, 1920. There was an adjudication of bankruptcy on October 25, 1920. *Held,* that

(1) The decisive date, as of which the stockholders of the trust company in liquidation under St. 1910, c. 399, § 20, now G. L. c. 167, § 22, must be ascertained for the purpose of enforcement of the stockholders' liability, was when the commissioner of banks took possession;

(2) The title to the shares of stock in question ought not to be held as a matter of law to have vested in the trustee in bankruptcy by relation to the date when the petition was filed, and the trustee ought not to be held to have become the owner for the purpose of the enforcement of the stockholders' liability until the date of adjudication in bankruptcy;

(3) The bankrupt, in a suit involving the enforcement of his liability as a stockholder, must be taken to have been the owner of the shares on the date when the commissioner took possession of the trust company.

A claim against a stockholder of a trust company under G. L. c. 172, § 24, is "upon a contract express or implied" and is of a nature provable in bankruptcy proceedings of a stockholder under § 63a, cl. 4, of the national bankruptcy act.

It is not necessary in a suit for the enforcement of the liability of stockholders of a trust company under G. L. c. 172, § 24, to join all stockholders of the trust company. .

The determination by the commissioner of banks, in the circumstances above described, that the liability of the stockholders of the trust company must be enforced to the full extent of the par value of its stock, was final and conclusive.

Since the word "provable" in § 68b of the national bankruptcy act refers to the nature of the claim at the moment when it is sought to set it off, not to its nature at the beginning of the pending bankruptcy proceedings, the commissioner of banks was entitled to set off the amount due from the bankrupt to the trust company on his stockholder's liability against the claim of the trustee on the certificate of deposit, above described.

The circumstances gave jurisdiction in equity upon the cross bill in the suit above described to require the trustee in bankruptcy to make equitable allowance for the claim of the commissioner of banks based on the stockholder's liability of the bankrupt against the claim, sought to be proved in the main suit on the certificate of deposit.

Action by or in behalf of a corporation against one of its directors for negligent performance of his managerial duties sounds in contract.

Damages in an action against a director of a trust company for wrongful conduct and gross neglect of his trust in permitting the making by the trust company of a certain loan can be liquidated under § 63b of the national bankruptcy act, and are provable in their nature; and on equitable principles, even if not strictly within the letter of G L. c. 232, § 1, in a suit by a trustee in bankruptcy of a director against the commissioner of banks in possession of the trust company to enforce allowance of a claim upon a certificate of deposit, such claim for damages must be allowed as a set-off in favor of the commissioner of banks representing the trust company.

In another suit by the trustee in bankruptcy above described against the commissioner of banks to establish a claim for the money paid by the bankrupt for the one thousand five hundred shares of stock of the new

issue of stock of the trust company on the ground that the issue was invalid because the vote authorizing it was not passed by a majority of the stock, a master found that it did not expressly appear that the vote was passed by a majority of the stock, but that, in the absence of evidence to the contrary, he assumed such to be the fact. *Held*, that the burden was on the plaintiff to show the invalidity of the stock, and that that burden was not sustained.

In the suit by the trustee in bankruptcy against the commissioner of banks to require proof of the claim for the amount paid by the bankrupt for the shares of the new issue above described, it was *held*, that, in the circumstances, the plaintiff was estopped to rely upon failure to comply with St. 1903, c. 437, § 40, as a basis for the establishment of his claim.

In a suit by a trustee in bankruptcy against the commissioner of banks in possession of the property and business of a trust company to compel allowance of a claim based upon payments made by the trust company of checks of the bankrupt after the filing of a petition in bankruptcy and notice thereof to the trust company, the defendant is not entitled to claim a set-off by reason of its payment, after the filing of the petition, of checks which the trust company had certified before the petition was filed when its officers knew of the bankruptcy of the depositor and that he was engaged in a fraudulent business.

In a suit in equity by a trustee in bankruptcy against the commissioner of banks in possession of the property and business of a trust company to require allowance of a claim based on payment by the trust company of checks of the bankrupt presented after the filing of an involuntary petition in bankruptcy, the defendant should be permitted on equitable grounds to set off an amount which, previous to the filing of the petition in bankruptcy and the taking possession by the commissioner, a stranger to the suit, who was the maker of a demand note payable to the trust company, had paid to the bankrupt, then a director of the trust company, in payment of the note, although the disposition made of the money thus paid was not shown.

THREE BILLS IN EQUITY, the first two filed in the Supreme Judicial Court for the county of Suffolk on January 17, 1922, and the third on March 16, 1922, by the trustees in bankruptcy of Charles Ponzi against the commissioner of banks in possession of the property and business of Hanover Trust Company.

Material allegations in the bills are described in the opinion. Upon the substitution of Henry V. Cunningham as sole trustee, the suits were prosecuted by him.

The suits were separately referred to the same master. Material findings by the master and questions raised by exceptions to his reports are described in the opinion. By order of *Crosby*, J., the suits were reserved upon the plead-

ings, the master's report and exceptions thereto for determination by the full court.

*H. D. McLellan,* (*C. M. Gordon & H. V. Cunningham* with him,) for the plaintiff.

*R. G. Dodge,* (*F. H. Smith, Jr. & H. S. Davis* with him,) for the defendants.

RUGG, C.J. These three suits have to do with the relations of one Ponzi to the Hanover Trust Company. Ponzi is a bankrupt and his affairs are being settled by his trustee in bankruptcy, who is the plaintiff in all the suits. The Hanover Trust Company is being liquidated by the commissioner of banks under G. L. c. 167, § 22, and is the defendant in all the suits. It may be assumed that the trust company is insolvent. See *Commissioner of Banks in re Prudential Trust Co.* 244 Mass. 64.

The first suit is brought to establish against the trust company a claim for $1,500,000 and interest. It is founded on a certificate of deposit for that amount issued to the bankrupt by the trust company on July 22, 1920. The defendants filed a cross bill alleging that the bankrupt was the holder of one thousand five hundred and seventy-five shares of the capital stock of the trust company, that the commissioner of banks in possession of the trust company for purposes of liquidation had levied an assessment on these and all other shares of such capital stock under G. L. c. 172, § 24, and further, that the bankrupt was a director of the trust company and as such responsible for certain losses sustained by the trust company, and praying that the defendants be allowed these claims either directly or by way of set-off. The precise nature of the other two suits will be stated in connection with the decision touching each. All these suits were referred to a master, who has filed full reports setting forth all the material facts with respect to every issue raised. The evidence is not reported. Therefore these findings of fact must be accepted as true since it is not argued that they are mutually inconsistent or contradictory and plainly wrong. *Glover* v. *Waltham Laundry Co.* 235 Mass. 330, 334.

## FIRST SUIT.

The main controversy under the plaintiff's first bill centers about an overdraft of $441,778.07 on the bankrupt's account as a depositor in the trust company. The commissioner of banks in possession of the trust company claims a right to set off the amount of this overdraft against what is due on the certificate of deposit. The plaintiff denies the existence of any right of set-off (1) because of the circumstances of the overdraft and (2) because the conduct of the parties amounted to a preferential payment to the trust company which the trustee in bankruptcy may recover.

The facts pertinent to the grounds of decision may be summarily stated. From December 20, 1919, to July 26, 1920, the bankrupt under the name of Securities Exchange Company was engaged in selling to very many people his own promissory notes on terms virtually amounting to promises of payment of principal in ninety days with fifty per cent interest. The sale of these notes was induced by vague pretences that the bankrupt was engaged in some form of dealing in which he was able to make enormous profits by taking advantage of the rates of foreign exchange. Almost invariably the bankrupt paid the amounts which would be due on these notes at maturity in forty-five days from date. Many notes were sold through agents, who received commissions of ten to fifteen per cent on the amounts taken from the purchasers. Other substantial expenses were incurred by the bankrupt. He had no legitimate business and made no profitable use of the money thus obtained, although investing comparatively small sums in the stock of several corporations and trust companies which did not result to his advantage. The money with which he paid his obligations was derived solely from the proceeds of further sale of his notes. His dealings increased so that on August 9, 1920, his outstanding notes amounted to $6,396,353.23, for which he had received $4,263,562.14 and to meet which he had assets of approximately $1,600,000.

The bankrupt had no assets of any considerable amount when he began these operations. Manifestly his insolvency

was inevitable and occurred certainly as early as February 1, 1920, and continued to an increasing degree down to August 9, 1920. The more of his notes he sold the more insolvent he was.

On May 24, 1920, the bankrupt opened with the trust company a deposit account which either in his own or in fictitious names remained continuously on its books until the commissioner took possession on August 11, 1920. As early as the first part of June, 1920, the managing officers of the trust company knew that Ponzi's deposits in that bank carried under different names consisted of sums which he had received from purchasers of his notes. They also knew that the face of said notes represented the amount which had been paid therefor increased by fifty per cent of said amount, that such notes were payable in ninety days from date, and that the bankrupt was making it a practice to pay them in full in forty-five days from their date. The bankrupt's account with the trust company indicated that he was not employing the money received from the public in any profitable enterprise, but was using it, without increase, for the purpose of paying his notes as or before they matured, and that such was the fact, was, or should have been, known to the officials of the trust company. On July 12, 1920, at the request of a vice-president and with the knowledge of other officers of the trust company, the bankrupt signed an agreement under seal authorizing the trust company at any time to declare any note or notes, upon which his name appeared, to be due and payable without demand and to charge the same to his account under whatever name carried. From this time onward the trust company had reason to believe and did believe that Ponzi was insolvent.

On July 22, 1920, in return for valid checks of the bankrupt aggregating that amount, the trust company issued a certificate of deposit payable to his order thirty days after notice in writing for the sum of $1,500,000. Full value was paid and received for this certificate. This certificate on its date was indorsed to the trust company and left in its possession for safekeeping. This whole transaction took place at the request of the trust company. The bankrupt was not then

indebted to the trust company and did not become so indebted until the overdrafts made on August 9, 1920. On July 27, 1920, the bankrupt gave written notice of demand for payment of this certificate of deposit which thereby became due and payable under St. 1910, c. 377, now G. L. c. 172, § 32, not before August 26, 1920.

The agreement of July 12, 1920, and the issuance of the certificate of deposit on July 22, 1920, were for the protection of the trust company in case of an overdraft on the bankrupt's checking accounts and were prompted by the desire of both the bankrupt and the trust company that the latter be secured in that event.

On July 26, 1920, by reason of action of public officers, induced by general publicity, discussion and consequent distrust of his operations, the bankrupt stopped selling more of his notes and advertised that he would pay all maturing obligations as presented and would return to such holders of his unmatured notes as so desired the amounts paid therefor without interest. In consequence of these and other events there was a run on the bankrupt, which continued through August 9, 1920. The trust company took various steps to facilitate the payment of Ponzi's checks issued because of the run. One of these was, at its suggestion but with the aid of the bankrupt, to gather as largely as possible his deposits in other banks and proceeds from sales of his available securities into its own hands in order to meet his checks drawn chiefly on it during the run, the trust company knowing all the while the purpose for which the checks were drawn.

The trust company knew also that the payments thus made by checks of the bankrupt on it afforded to the holders of his notes so paid a greater proportion of their debts than could be obtained by others of his creditors of the same class. On August 2, 1920, when the trust company had for some time known of the insolvency of the bankrupt, an article with large headlines on the first page appeared in a leading Boston newspaper, stating that the bankrupt was hopelessly insolvent, followed by other articles in denial thereof by the bankrupt. Other facts occurred, unnecessary now to narrate, which must have emphasized to the trust

company knowledge of the actual insolvency of the bankrupt and its inevitable early publicity a number of days before the petition in bankruptcy was filed.

The credit balance on the checking account of the bankrupt in the trust company at the close of business on Saturday, August 7, was $13,391.32. Inasmuch as no new deposits of any considerable amount were then being made, it was reasonably to be anticipated that on August 9 an overdraft of the account would occur. On that day, in anticipation of such an overdraft, a representative of the commissioner of banks was present at the office of the trust company watching the state of the bankrupt's account. At about 1:45 P. M. he reported to the treasurer of the trust company that " the Lucy Martelli account " (an account of the bankrupt carried in that fictitious name) was then overdrawn, and the commissioner of banks almost immediately thereafter by telephone message directed the trust company to pay no more of the bankrupt's checks. The trust company, however, refused to comply with this direction and continued to honor all checks presented until about 2:45 P. M. when it received a written order from the commissioner of banks to stop paying checks of the bankrupt. After receipt of the written order the trust company did not pay or certify any more checks so drawn.

At the close of business on August 9, 1920, the account of the bankrupt in the trust company was overdrawn to an amount in excess of $300,000. By the return unpaid of two checks deposited to his credit on August 7, this overdraft was swelled on the morning of August 10, 1920, to the sum of $441,878.07.

The master reports as to the details of the overdraft in these words: " I have no means of determining what amount, if any, of the payments made which constituted the overdraft, went to note holders whose notes were paid in full, as distinguished from note holders who were presenting notes which had not matured in order to receive back the actual amount they had paid therefor without addition, and thus might be found to be rescinding their contracts (See *Lowell* v. *Brown,* 284 Fed. Rep. 936), or when the latter class

bought their notes.  As to this matter I find that the only evidence of rescission is the fact that on July 27, 1920, Ponzi advertised that he would pay matured notes in full and would pay to the holders of unmatured notes the amounts originally paid by them and the fact that certain note holders thereafter received only the amounts originally paid for their notes. In this connection I also find that the persons who received the amounts originally paid by them received a greater proportion of their claims than can now be received by other note holders.  If further findings upon this point are necessary, I must infer that the greater part of the payments made to note holders between July 27 and August 9 was made up of payments to note holders who received back no more than they had paid; but I must also find that the payments made to note holders whose notes were paid in full exceeded the sum of $1,000,000.  I also infer that the greater part of the charges to the ' Lucy Martelli ' account [one of the bankrupt's accounts] of August 9 was made up of payments to note holders who received no more than they had paid."

On August 9, 1920, at 1:40 o'clock P. M. an involuntary petition in bankruptcy was filed against Ponzi upon which on October 25, 1920, he was duly adjudged a bankrupt. Of the filing of this petition the trust company had notice on the same afternoon after the close of banking hours. Subsequent to the filing of the petition in bankruptcy and after the trust company knew of it, the trust company drew three certificates of deposit, each for $500,000, dated July 22, 1920, which the bankrupt indorsed in blank.  These three certificates of deposit were substituted for the certificate for $1,500,000, which was stamped on the back, " Hanover Trust Company Aug. 10, 1920, Paying Teller," and were left in the possession of the trust company, nothing being said, so far as the evidence discloses, as to the purpose of leaving them.  On the morning of August 10, 1920, the balance of the bankrupt's account was struck, showing an overdraft as of the close of business on the preceding day of $441,778.07. Thereupon the treasurer of the trust company drew a check on it, signed by himself as treasurer, for $441,778.07, payable

to the trust company, and also made out a certificate of deposit for $58,221.93 payable to Charles Ponzi or order, signed only by Charles A. Garraghan, Assistant Treasurer of said Trust Company, and dated July 22, 1920. One of three certificates of deposit for $500,000 was thereupon stamped " Hanover Trust Company Aug. 10, 1920." The certificate of deposit for $58,221.93 was indorsed in blank by Ponzi and left, with the other two certificates for $500,000 each, with the trust company, nothing, so far as the evidence disclosed, being then said as to the purpose for which they were left. The amount of the treasurer's check, $441,778.07, was credited to one of Ponzi's accounts and the amount of the overdraft thereby balanced.

A bank receiving deposits and paying the checks of its depositors in good faith in the ordinary course of business commonly incurs no liability to anybody under the bankruptcy act. A bank may set off the amount of deposits of one of its customers against the amount due to it on debts of such customer at the moment when such customer goes into bankruptcy, provided the deposits were not made with a view to such set-off with notice of such bankruptcy. This right is recognized and its exercise regulated by § 68 of the bankruptcy act as interpreted by authoritative decisions. *New York County National Bank* v. *Massey,* 192 U. S. 138. This right of set-off in cases of mutual debts or mutual credits exists even though the result may be to enable the bank to secure payment of a loan honestly made to the bankrupt by it within four months before bankruptcy to enable him to pay some of his pressing creditors and thus continue his business. *Putnam* v. *United States Trust Co.* 223 Mass. 199, 202. *Studley* v. *Boylston National Bank,* 229 U. S. 523.

The principles established by those decisions are not applicable to the facts in the case at bar. The bankrupt was not engaged in any legitimate business. The vast sums of money which came into his possession were not invested. No profitable use was being made of them. Because the bankrupt was the largest depositor in the trust company and because of the magnitude of his transactions, the officers of the trust company may have been dazzled. They are not to

be held responsible for events subsequently discovered but not known at the time of their acts now under review. The trust company is to be held to responsibility on the footing of facts then known to its officers, and not otherwise. The rights of the parties are to be ascertained and adjusted on the basis of what then were established facts to their knowledge before the filing of the petition in bankruptcy. The officers of the trust company knew Ponzi was a bankrupt at latest on July 12, 1920. The only rational inference which as banking officials or as ordinary business men they could draw from the facts actually known to them was that the bankrupt was a swindler. The facts actually known to them were susceptible of no other construction to the thinking business mind. A man, conducting such operations as the trust company knew at least as early as July 12, 1920, that the bankrupt was engaged in, was entitled to no assistance in carrying on his schemes. The bankrupt must be presumed to have intended the natural and inevitable consequences of his acts. He is chargeable with an intention that his affairs would be settled ultimately in the bankruptcy court.

There was nothing inherently wrong in giving to the bankrupt the certificate of deposit on July 22, in exchange for checks drawn on his checking account. In some aspects advantages have flowed from that transaction. The certificate of deposit, however, was governed by the terms of St. 1910, c. 377, now G. L. c. 172, § 32. That statute in express terms prohibits under a substantial penalty a trust company from allowing such a deposit to be withdrawn before the time therein specified or, where no definite time is mentioned, before the expiration of at least thirty days from a written notice of withdrawal. The trust company knew of this statute.

The trust company allowed the bankrupt to overdraw his account. There was no mistake, accident, or misunderstanding on its part in paying these overdrafts. It was the duty of the trust company to know the state of its depositor's account. In addition to knowledge thus imputable to it, the trust company received instant and express notice from the commissioner of banks when the balance on the bank-

rupt's account was exhausted. It refused to stop honoring these overdrafts on the oral direction of the commissioner of banks and only ceased honoring them when written notice from the commissioner of banks was served on it. The trust company knew that these overdrafts were used to prefer some of the bankrupt's creditors over others. In any event, it was bound under all the circumstances to know that such use was made of the overdrafts. The trust company was bound to pay the bankrupt's checks as long as his credit was sufficient to meet them. *Wiley* v. *Bunker Hill National Bank*, 183 Mass. 495. *Castaline* v. *National City Bank of Chelsea*, 244 Mass. 416. *Armstrong* v. *American Exchange National Bank of Chicago*, 133 U. S. 433, 466. That was the extent of its duty. It had no right under the statute to use the credit established by the certificate of deposit to pay overdrafts made under the circumstances here disclosed. When a banking institution honors checks of its depositor in excess of his deposit, it is doing something outside its duty. It is in substance and effect making a loan to such depositor to the extent of the overdraft. The transactions of August 9, 1920, between the trust company and the bankrupt were therefore the equivalent of a loan by the trust company to him of the amount of the overdraft. Having made this loan, the trust company undertook to secure itself. The circumstance that on August 10, 1920, after the petition in bankruptcy was filed, it took payment for the overdraft out of the certificate of deposit, we do not treat as decisive. *Studley* v. *Boylston National Bank*, 229 U. S. 523, 529. Whatever the bankruptcy law would require in the final settlement might have been done by the parties then. It is manifest that the trust company did not make this loan by way of overdraft on the credit of the bankrupt. This loan was made on the supposed security of the certificate of deposit issued to the bankrupt. The loan may have been made on the strength of the expectation of immediate payment through the surrender of the first certificate of deposit and the issuance of new certificates of deposit for the amount remaining out of the original certificate after deducting the amount of the loan on the over-

draft, that is to say, on the strength of the expectation of the form of transaction which with the aid of the bankrupt was executed by the trust company on the morning of August 10, 1920: or the loan may have been made in reliance on the right of setting off the loan of the overdraft against the amount due on the original certificate of deposit recognized by § 68 of the bankruptcy act, in the event that the depositor should go into bankruptcy. As rational beings the officers of the trust company in making the loan of the overdraft in the light of their knowledge of the transactions of the bankrupt and his financial condition could have acted on no other theory. Therefore they made the loan on the strength of the security of the certificate of deposit to be utilized in one way or another. The position of the trust company as both debtor and creditor of the bankrupt, debtor to the amount of the certificate of deposit and creditor to the amount of the loan by way of overdraft, gave it this apparent security. That position gave the trust company in law no advantage over any other person with the knowledge it had lending money to a bankrupt. The trust company can stand no better than an outside person making a loan of the amount of the overdraft on the security by indorsement or assignment of the certificate of deposit with like knowledge as to the financial operations and condition of the bankrupt and the uses to be made of the loan. Its position as banker and both debtor and creditor of the bankrupt cannot be utilized to give it opportunity to secure a preference which does not arise out of the ordinary course of banking business. *Cregg* v. *Merchants Trust Co.* 248 Mass. 524. An outsider under such circumstances would not be permitted to retain his security against the claim of a trustee in bankruptcy. One knowingly lending money to a hopeless bankrupt, for the purpose of enabling the bankrupt to prefer some of his creditors over others of his creditors who thereby are deprived of the benefits of the bankruptcy act, cannot retain or enforce security taken for such a loan. It was said in *Dean* v. *Davis*, 242 U. S. 438, at page 444: "As provided in § 67d, [of the bankruptcy act] only ' liens given or accepted in good faith and not in contemplation of or in

fraud upon this Act' are unassailable. A transfer, the intent (or obviously necessary effect) of which is to deprive creditors of the benefits sought to be secured by the bankruptcy act 'hinders, delays or defrauds creditors' within the meaning of § 67e . . . where the advance is made to enable the debtor to make a preferential payment with bankruptcy in contemplation, the transaction presents an element upon which fraud may be predicated. The fact that the money advanced is actually used to pay a debt does not establish good faith. It is a question of fact in each case what the intent was with which the loan was sought and made."

The principle thus declared appears to us to be precisely applicable to the case at bar. The overdraft was used to pay in full creditors of the bankrupt at a time when the trust company knew of his bankruptcy and that the only possible result of paying some of his creditors in full would be to reduce still further the percentage which the remainder would receive. It has been established that the holders of unmatured notes seeking to rescind were creditors of the bankrupt and that the repayment to holders of unmatured notes of the amounts originally paid was a preference of those persons by the bankrupt. *Cunningham* v. *Brown,* decided by the Supreme Court of the United States on April 28, 1924, 265 U. S. 1. It is a matter of indifference whether the overdrafts were used to pay matured or unmatured notes of the bankrupt. In either case such payments were preferences by the bankrupt.

By the express terms of § 68b of the bankruptcy act, " A set-off or counterclaim shall not be allowed in favor of any debtor of the bankrupt which (1) is not provable against the estate; or (2) was purchased by or transferred to him after the filing of the petition, or within four months before such filing, with a view to such use and with knowledge or notice that such bankrupt was insolvent, or had committed an act of bankruptcy." The prohibition of this section seems to us to prevent the trust company from availing itself of the overdraft by way of set-off. The fact that the master has found that there was no collusion between the trust company

and the creditors of the bankrupt who secured a preference through his overdraft on the trust company does not avail the trust company in attempting to set off the overdraft against its liability on the certificate of deposit.

The case at bar is distinguishable from cases where one lends money in good faith on security to a business man somewhat embarrassed, or even insolvent, but who has a legitimate business and honestly hopes thereby to tide over his difficulties and regain solvency. *Tiffany* v. *Boatman's Institution,* 18 Wall. 375.   *Crowder* v. *Allen-West Commission Co.* 213 Fed. Rep. 177.   Such security will stand against proceedings in bankruptcy.   But in the case at bar the bankrupt had no real business.   No amount of money loaned to him could enable him to rehabilitate a genuine commercial enterprise because he was not conducting any such enterprise.   He was hopelessly bankrupt to the knowledge of the trust company.   The trust company was thoroughly aware in detail of the imposition he was practising on the public.

The present case also is distinguishable from those where a creditor takes a preference from an insolvent debtor which it is compelled to surrender under the bankruptcy law. Such creditor is not subject to a further penalty but in the bankruptcy court may prove his claim as unsecured. *Keppel* v. *Tiffin Savings Bank,* 197 U. S. 356.   *Wells* v. *Lincoln,* 214 Fed. Rep. 227.   But such unsecured claim in our opinion is not available by way of set-off under § 68b.

The trust company lent the bankrupt the money on the overdraft on the security of the certificate of deposit in violation of St. 1910, c. 377, now G. L. c. 172, § 32.   It knew the bankrupt was insolvent, that he had no legitimate business, that he was conducting a scheme to cheat large numbers of the public, and that the money it lent him would be used to prefer some of his creditors at the expense of others, and that the commissioner of banks had forbidden it to make the overdraft.   Without emphasizing any one of these factors as decisive, their collective effect in our opinion is to show that the loan by way of overdraft by the trust company cannot be set off under § 68 of the bankruptcy act

against the certificate of deposit, that the security taken by the trust company cannot be retained and that the trust company must be left by the law where its own acts leave it. *Traders' Bank* v. *Campbell,* 14 Wall. 87. *Rubenstein* v. *Lottow,* 220 Mass. 156, 169. *Duane* v. *Merchants Legal Stamp Co.* 231 Mass. 113. *Crowder* v. *Allen-West Commission Co.* 213 Fed. Rep. 177. *In re Soforenko,* 210 Fed. Rep. 562, *Seligman* v. *Gray,* 227 Fed. Rep. 417.

The circumstance that the commissioner of banks is liquidating the trust company for the benefit of its creditors places him in no better position than the trust company itself would be in respect to such transactions as those here involved.

Our conclusion upon this branch of the case is that the claim of the plaintiff against the trust company is established in the sum of $1,500,000 with interest at the rate of four and one half per cent from its date, July 22, 1920, to August 11, 1920, when the commissioner of banks took possession of the trust company.

The defendants by their cross bill seek to establish liability of the bankrupt or his trustee as a stockholder in the trust company and to set off the liability thus established against the claim of the bankrupt on the certificate of deposit. The facts as found by the master with respect to which the law must be applied are these in brief: Certificates of stock, in all for seventy-five shares of the original capital stock of the trust company, were issued to four different persons. Each was indorsed in blank and of all these shares the bankrupt became owner probably in June, 1920. None of these shares was transferred to the bankrupt on the books of the bank. Sixty-five of these shares were inventoried as a part of his estate in bankruptcy. The by-laws of the trust company provided that no voluntary transfer of shares of stock should be valid to pass title except after permission by the executive committee or an offer under stated conditions to the directors. There was no affirmative and detailed compliance with this by-law. In June, 1919, at the annual meeting of the stockholders of the trust company, votes were passed to increase the capital stock and surplus by issuing two thousand new

shares of stock at $125 per share. This increase was approved by the bank commissioner as required by St. 1916, c. 37, now G. L. c. 172, § 18. At the annual meeting of the stockholders of the trust company held on June 8, 1920, the bankrupt was elected and sworn as a director of the trust company. By R. L. c. 116, § 9, then in force, no one but a stockholder could be a director. See now G. L. c. 172, § 14. At a meeting of directors held on the following day, the bankrupt was elected a member of the executive committee for one year. On June 15, 1920, the full price of $187,500 having been paid by the bankrupt, the trust company at his request delivered to him certificates purporting to represent one thousand five hundred shares of the new issue of stock. One for two hundred shares was in his own name. Fourteen other certificates for divers numbers of shares were in the names of his nominees, who paid no part of the consideration therefor and who had no beneficial interest therein. These certificates remained in the ownership and possession of the bankrupt until they passed into the possession of his receivers and later of his trustees in bankruptcy. The remaining five hundred shares of the new issue of stock were fully paid for and certificate issued therefor. Following this purported increase in the capital stock of the trust company, no articles of amendment were prepared and submitted to the commissioner of corporations or filed with the secretary of the Commonwealth pursuant to the provisions of St. 1903, c. 437, §§ 41, 42, now G. L. c. 156, §§ 43, 44. On or about May 6, 1921, the agent of the commissioner of banks in possession of the trust company prepared articles of amendment dated May 6, 1921, stating the increase of the capital stock and surplus, and procured the same to be signed by the proper officers of the trust company in office on June 10, 1919. These articles of amendment then were presented to the commissioner of corporations, who refused to receive or consider them. They were not filed with the secretary of the Commonwealth.

These facts are sufficient to establish that the bankrupt was a holder, with respect to the corporation in its present condition of liquidation for the benefit of its creditors, of

the one thousand five hundred and seventy-five shares of its capital stock.

There was a legal creation of the increase of capital stock. It was duly voted by the stockholders as required by law. It was approved by the public officer as designated by law. This approval is no ministerial function. "Approval" in the connection in which it is used in St. 1916, c. 37, G. L. c. 172, § 18, implies the exercise of sound judgment, practical sagacity, wise discretion and final direct affirmative sanction. *McLean* v. *Mayor of Holyoke,* 216 Mass. 62. There was full payment in cash of the par value of the stock. These are essentials. No stock can lawfully issue unless they all are found to exist. It is conceivable that the vote to increase, approval of increase by the bank commissioner, full payment in cash for par value of stock and actual issuance of certificates might all take place before the time expired within which the preparation of the articles of amendment duly signed, presentation of them to the commissioner of corporations and filing them with the secretary of the Commonwealth might be done. The bankrupt was one of the board of directors and a member of the executive committee of the trust company, with all the obligations thereby implied. The bankrupt paid for his shares of stock in full. Certificates of the new issue of stock in regular form were issued to him and to his nominees. The entire amount of the increase of capital stock was paid in full. It was accepted by the trust company as such increase and so entered on its books and so treated in its business. It is not necessary to delimit the meaning of St. 1903, c. 437, § 41, now G. L. c. 156, § 43, to the effect that " No. amendment or alteration of the agreement of association or articles of organization shall take effect until said articles of amendment shall have been filed in the office of the secretary of the Commonwealth." It is enough to say that the circumstances here disclosed prevent the bankrupt and his trustee in bankruptcy from disputing that he was a stockholder. *Newcomb* v. *Reed,* 12 Allen, 362. *Walworth* v. *Brackett,* 98 Mass. 98. *Casey* v. *Galli,* 94 U. S. 673, 680. *Sanger* v. *Upton,* 91 U. S. 56, 64. *Eaton* v. *Aspinwall,* 19 N. Y. 119. The failure to comply with that

statutory requirement does not affect the rights and liabilities of the stockholder and the corporation as to each other on the facts here disclosed.   It does not diminish the obligations of either toward those creditors who to some extent must rely upon the presumption of regularity touching such matters.   *Duffy* v. *Treasurer & Receiver General,* 234 Mass. 42, 50.   *Korbly* v. *Springfield Institution for Savings,* 245 U. S. 330, 336.

A contention somewhat similar to that here urged by the plaintiff was disposed of in *Scott* v. *Deweese,* 181 U. S. 202, at page 209, in these words: " The defendant lays great stress on the words in section 5142 [Rev. Sts. of U. S.], ' no increase of capital shall be valid until the whole amount of such increase is paid in,' and until the Comptroller shall certify that the amount of the proposed increase ' has been duly paid in as part of the capital of such association.'   But does it follow that one who claimed to be a shareholder in respect of an increase of the bank's capital, and who was recognized as such by the bank, particularly if he held a formal certificate stating that he was a shareholder, can escape liability, under § 5151 [Rev. Sts. of U. S.], by simply proving — after the bank has suspended and has been placed into the hands of a receiver — that the *whole* amount of the proposed increase was not in fact ' paid in ' as required by § 5142, although the contrary was certified by the Comptroller upon the bank's report · to that officer?"   That principle governs the case at bar.   *Handley* v. *Stutz,* 139 U. S. 417, 423–426.   *Chubb* v. *Upton,* 95 U. S. 665.   *Veeder* v. *Mudgett,* 95 N. Y. 295.   See opinion in *Winters* v. *Armstrong,* 37 Fed. Rep. 508, 517–520, by the late Mr. Justice Jackson while Circuit Court judge.

The case at bar is distinguishable from *American Tube Works* v. *Boston Machine Co.* 139 Mass. 5, and *Reed* v. *Boston Machine Co.* 141 Mass. 454.   In those cases the vote of the stockholders purporting to authorize new stock was invalid because not in conformity to the statute.   The vote to increase was valid in the present case.   Cases like *Attorney General* v. *Massachusetts Pipe Line Gas Co.* 179 Mass. 15, and *Falmouth* v. *Falmouth Water Co.* 180 Mass. 325, are distinguishable .on the ground that the statutes there under

consideration required approval by a public board as a prerequisite to the validity of the issue. Those statutes correspond to the requirement of approval by the bank commissioner under St. 1916, c. 37, now G. L. c. 172, § 18, which was procured in the case at bar. The duties imposed on the commissioner of corporations by St. 1903, c. 437, §§ 41, 42, now G. L. c. 156, §§ 43, 44, with respect to articles of amendment to be submitted to him, did not involve the exercise of discretion but the administrative function of certification of conformity to law, while that of the secretary of the Commonwealth in receiving was clerical. Without minimizing in any degree the importance of compliance with those statutory mandates in other respects, it is enough to say that failure to conform to them does not in the present case prevent the bankrupt from being treated as sustaining the relation of stockholder to the trust company. See *Chase's Patent Elevator Co.* v. *Boston Tow-Boat Co.* 152 Mass. 428. One main purpose of the trust company statute, as of the national banking act, is to make the stockholders' liability a genuine security for creditors. Where the trust company has complied with the essential and substantial requirements of the statute for increasing its capital stock, including the approval of the designated public officer, has received full payment therefor and treated such payment as part of its capital assets, and has issued certificates therefor, and the stockholder, who also is an officer in active and responsible supervision of its affairs, has paid for the stock and received the certificates therefor, such stockholder cannot, after insolvency and liquidation of the trust company has supervened, be heard to deny that he is liable as a stockholder.

The fact that the certificates for the seventy-five shares of the original issue of stock were suffered by the bankrupt to remain on the books of the trust company in the names of the original holders does not affect the bankrupt's liability even though that of the original holders may continue. The same principle applies to the certificates of the new issue suffered to be in the names of the nominees of the bankrupt. It was declared in *Pauly* v. *State Loan & Trust Co.* 165 U. S. 606, 619, 620, as the first of several rules deducible from an

exhaustive review of decisions, " That the real owner of the shares of a national banking association may, in every case, be treated as a shareholder within the meaning of section 5151 " of U. S. Rev. Sts. which relates to stockholders' liability. *Houghton* v. *Hubbell,* 91 Fed. Rep. 453. That rule applies to the case at bar because our statute is largely copied from the national bank act and is ordinarily to be interpreted as that act had been interpreted previously to its adoption here. *Commissioner of Banks* v. *Prudential Trust Co.* 242 Mass. 78, 83, 84.

The determination of the commissioner of banks in possession of the trust company for purposes of liquidation to enforce stockholders' liability was valid even though made before the recovery of judgment by a creditor against the corporation and the occurrence of the other conditions precedent to the maintenance of proceedings to enforce such liability. At the time when the bill and cross bill were filed there had been compliance with all prerequisites essential to the enforcement of stockholders' liability. Such determination by the commissioner of banks was not premature. *Commissioner of Banks* v. *Cosmopolitan Trust Co.* 247 Mass. 334, 343.

It is undoubted law that a trustee in bankruptcy may refuse to accept title to property of the bankrupt if in his opinion it is worthless or likely to be a burden rather than a benefit. *Greenall* v. *Hersum,* 220 Mass. 278. That principle is not applicable to the record in the case at bar. The certificates for sixty-five shares of stock in the trust company were inventoried as a part of the estate of the bankrupt. The answer to the cross bill contains no renouncement of title to the shares of stock, but rests the defence on other grounds. The trial proceeded on the issues raised by the pleadings. The master's report contains no finding on this subject. The only reference to it in the record is a letter dated November 14, 1921, from one of the trustees of the bankrupt to the liquidating agent of the trust company, to the effect that the shares of the new issue were illegal and that as to the other shares the principle of onerous property might be relied on. This letter was sent

more than a year after the adjudication in bankruptcy. This seems to us to fall far short of an election to treat any or all the shares on that footing. It is too late now for the trustee to raise such a defence. It is incompatible with his conduct hitherto. The right must be exercised within a reasonable time. *Dushane* v. *Beall*, 161 U. S. 513, 515.

• The title to the shares of stock which was in the bankrupt passed to his trustees in bankruptcy " as of the date he was adjudged a bankrupt." Section 70a of the bankruptcy act. That date was October 25, 1920. The decisive date as of which the stockholders of a trust company in liquidation under St. 1910, c. 399, § 2, now G. L. c. 167, § 22, must be ascertained for the purpose of enforcement of stockholders' liability under St. 1905, c. 228, § 1, now G. L. c. 172, § 24, is when the commissioner of banks took possession. That date was August 11, 1920. *Commissioner of Banks* v. *Hanover Trust Co.* 247 Mass. 347. The property of a bankrupt is considered as *in custodia legis* from the time of filing the petition, which in the present case was August 9, and for many purposes the title reverts to that time. *Acme Harvester Co.* v. *Beekman Lumber Co.* 222 U. S. 300. *Bailey* v. *Baker Ice Machine Co.* 239 U. S. 268. *Fairbanks Steam Shovel Co.* v. *Wills*, 240 U. S. 642. No transfer of these certificates of stock has been made to the trustee of the bankrupt. It seems to us that the title to these shares of stock ought not to be held as matter of law to have vested in the trustee in bankruptcy by relation to the date when the petition was filed, and that at least the trustee ought not to be held to have become owner until the date of the adjudication in bankruptcy or the appointment of the trustee. We are of opinion that the bankrupt must be taken to have been the owner of the shares on August 11, 1920, when the commissioner took possession of the trust company.

The language of our statute, G. L. c. 172, § 24, as to liability of stockholders in trust companies, was taken almost word for word from U. S. Rev. Sts. § 5151. The interpretation given to that section by the Supreme Court of the United States is therefore of persuasive force as to the meaning and scope of our § 24. *Commissioner of Banks* v. *Prudential*

*Trust Co.* 242 Mass. 78, 83, 84.   It was decided in *Richmond* v. *Irons,* 121 U. S. 27, 55, 56, after distinguishing *Dane* v. *Dane Manuf. Co.* 14 Gray, 488, *Bacon* v. *Pomeroy,* 104 Mass. 577, *Ripley* v. *Sampson,* 10 Pick. 371, *Bangs* v. *Lincoln,* 10 Gray, 600, and *Gray* v. *Coffin,* 9 Cush. 192, as based upon the particular language of our statutes establishing a narrow and limited liability of stockholders and directors in business corporations, (see G. L. c. 158, §§ 44, 45,) " materially differing from that contained in the national banking act," that " Under that act [the national banking act] the individual liability of the stockholders is an essential element in the contract by which the stockholders became members of the corporation.   It is voluntarily entered into by subscribing for and accepting shares of stock.   Its obligation becomes a part of every contract, debt, and engagement of the bank itself, as much so as if they were made directly by the stockholder instead of by the corporation.   There is nothing in the statute to indicate that the obligation arising upon these undertakings and promises should not have the same force and effect, and be as binding in all respects, as any other contracts of the individual stockholder."   This states the substance and effect of the liability of stockholders in Massachusetts trust companies under G. L. c. 172, § 24.   *Miller* v. *Hamner,* 269 Fed. Rep. 891, 894.   *Van Tuyl* v. *Schwab,* 174 App. Div. (N. Y.) 665, affirmed in 220 N. Y. 661.   It has been held in numerous decisions that the peculiar statutory liability imposed upon shareholders in business corporations is different in nature.   It cannot be proved as a debt against assets of a stockholder in insolvency or bankruptcy unless it first has been liquidated and ascertained before the time for proving debts has expired.   *Kelton* v. *Phillips,* 3 Met. 61, 62. *Bangs* v. *Lincoln,* 10 Gray, 600.   *Garrett* v. *Sayles,* 1 Fed. Rep. 371, 377.   *American File Co.* v. *Garrett,* 110 U. S. 288. *Gray* v. *Coffin,* 9 Cush. 192.   *Old Colony Boot & Shoe Co.* v. *Parker-Sampson-Adams Co.* 183 Mass. 557, 559–562.   That principle is not applicable to the facts here disclosed.   Those cases all are distinguishable from the case at bar for the reason that the statutory basis of liability here invoked is radically different from that under discussion in those

decisions. It is only the method of enforcement of these diverse liabilities that is similar under our trust company statutes. *Cosmopolitan Trust Co.* v. *Cohen,* 244 Mass. 128.

The liability arising out of the assessment is, therefore, "upon a contract express or implied." Hence it is of a nature provable in bankruptcy under § 63 a, cl. 4, of the bankruptcy act. It is none the less a provable claim because the statutory remedy for its collection is in equity. *James* v. *Gray,* 131 Fed. Rep. 401. It is not affected in its nature because the normal remedy also is by joint suit. When circumstances are such that a joint suit against all stockholders cannot be brought by the commissioner of banks in possession of the trust company for purposes of liquidation, the right to enforce the stockholders' liability does not fail. Bankrupt joint obligors may be pursued separately. *County Commissioners* v. *Hurley,* 169 Fed. Rep. 92, 97. *Moore* v. *Simms,* 257 Fed. Rep. 540. The dominant purpose of the statute is to afford security to creditors of the trust company through stockholders' liability. So far as reasonably practicable in the interpretation of the statute, the form of remedy must yield to that end. It is not essential that all stockholders of a trust company, who are " liable, equally and ratably and not one for another " for its contracts, debts and engagements, must be joined in one suit. Such construction would defeat in part the purposes of the act. It cannot be presumed to have been the purpose of the General Court to exonerate from such liability stockholders who are bankrupts. *Commissioner of Banks* v. *Cosmopolitan Trust Co.* 247 Mass. 334.

The determination of the commissioner of banks in possession of the trust company for liquidation that the stockholders' liability must be enforced to the full extent of its par value is final, conclusive and not open to further discussion. *Commissioner of Banks* v. *Prudential Trust Co.* 242 Mass. 78, 84, 85, and cases there collected.

The report of the master shows the existence of all other facts essential to the establishment of stockholders' liability. It follows that the commissioner of banks has against the estate of the bankrupt a claim in contract based on the

stockholder's liability of the bankrupt for $157,500. It is of a provable nature. If it had accrued within the time when it might have been proved under § 57n of the bankruptcy act, it might have been so proved. This is a suit in equity by the trustee in bankruptcy against the defendant as debtor of the bankrupt. In such case the provisions for set-off in § 68b of the bankruptcy act are applicable. The claim for stockholders' liability had in truth become liquidated as to amount before the present suit was instituted. " ' Provable ' [in that section] means provable in its nature at the time where the set-off is claimed not provable in the pending bankruptcy proceedings." All this was settled in an opinion by Chief Justice Holmes in *Morgan* v. *Wordell,* 178 Mass. 350, the reasoning of which need not be repeated.

It follows in our opinion that the defendant is entitled to set-off of the amount of the assessment on the stock of the bankrupt in the trust company. If, however, we are wrong in holding that title to the shares of stock was in the bankrupt when the commissioner of banks took possession of the trust company, and if the case at bar with respect to the shares of stock falls within the rule that the purpose of the bankruptcy act under such circumstances was " to fix the line of cleavage with reference to the condition of the bankrupt estate as of the time at which the petition was filed and that the property which vests in the trustee at the time of adjudication is that which the bankrupt owned at the time of the filing of the petition," *Everett* v. *Judson,* 228 U. S. 474, 479, the practical result is the same. If title to the stock passed to the trustee in bankruptcy as of the date when the petition was filed, then the trustee was the owner when the commissioner of banks took possession of the trust company. Liability on the stock was not extinguished by bankruptcy of the owner. If sold to some one else, such purchaser would have been liable if other necessary conditions concurred. If title was retained by the trustee in bankruptcy, he was the owner. *Commissioner of Banks* v. *Hanover Trust Co.* 247 Mass. 347. The trustee in bankruptcy has come into a court of equity to establish a claim against the assets of the trust company in liquidation. He must do equity with

reference to obligations due with respect to the estate of the bankrupt to the trust company. The rule is applicable that a plaintiff in equity may be required as a condition of relief to discharge an obligation due justly to the other party even if it is not strictly available by way of set-off. *Sturgis* v. *Champneys,* 5 Myl. & Cr. 97. *Miner* v. *Beekman,* 50 N. Y. 337, 345. *Goodenow* v. *Curtis,* 33 Mich. 505. *Lindell* v. *Lindell,* 150 Minn. 295. The trust company is insolvent and its affairs are being settled under the statute for the benefit of its creditors. A claim of a creditor against the trust company under such circumstances ought not to be allowed in full as matter of equity where there is a stock liability due from or in the right of such creditor to the trust company unless allowance first is made for that stock liability. This appears to be the rule followed in the bankruptcy court. Any person presenting such claim must make equitable allowance for the claim due on his account, even though not available as a technical set-off. *Boatmen's Bank* v. *Laws,* 257 Fed. Rep. 299. *Kiskadden* v. *Steinle,* 203 Fed. Rep. 375, 382. *In re Caledonia Coal Co.* 254 Fed. Rep. 742. On this footing the amount due on the stockholder's liability on the stock owned by the bankrupt must be deducted as a condition of the proof and allowance of the claim of the bankrupt on the certificate of deposit.

The defendant also seeks to set off against the claim of the plaintiff on the certificate of deposit a further claim against the bankrupt. That claim in set-off is founded on wrongful conduct and gross neglect of his trust and duty by the bankrupt as director and member of the executive committee of the trust company in voting to make and ratify certain loans to irresponsible borrowers and in excess of amounts allowed by law. With respect to these contentions the findings of the master are against the bankrupt upon one note only, namely, that of the Polish Industrial Association, Inc. That transaction was found to be a loan made in violation of the statute now in G. L. c. 172, § 40, not reasonably safe, and that the executive committee in authorizing and approving it acted without prudence or proper regard for the interests of the trust company. It is not necessary to narrate these facts.

They are such as to establish liability on the part of such director under the principles recently elaborated in *Cosmopolitan Trust Co.* v. *Mitchell,* 242 Mass. 95. They show that he failed to exercise ordinary care and prudence in managing the affairs of the trust company in this particular instance and was wanting in sound judgment and reasonable vigilance. Action by or in behalf of a corporation against one of its directors for negligent performance of his managerial duties sounds in contract. In substance and effect it is a breach of the contract which springs into existence by acceptance of the office of director and the assumption of its duties. That was established in principle by *Warren* v. *Para Rubber Shoe Co.* 166 Mass. 97, and *Cosmopolitan Trust Co.* v. *Mitchell,* 242 Mass. 95, 121. It expressly has been so held in other jurisdictions. *Boyd* v. *Schneider,* 65 C. C. A. 209. *Concha* v. *Murrieta,* 40 Ch. Div. 543, 553. *Wallace* v. *Lincoln Savings Bank,* 89 Tenn. 630, 651. It seems to have been assumed to be the law if not expressly so decided in *Bates* v. *Dresser,* 251 U. S. 524, 527.

The breach of duty was established in the absence of evidence that the bankrupt, being present at meetings, opposed the making of the loan in question. *Banks* v. *Darden,* 18 Ga. 318, 340. *Ashurst* v. *Mason,* L. R. 20 Eq. 225, 234.

Provable debts under the bankruptcy act include all liabilities of the bankrupt founded on contract express or implied which existed at the time of the bankruptcy and either were fixed in amount or susceptible of liquidation. *Williams* v. *United States Fidelity & Guaranty Co.* 236 U. S. 549, 556. *Zavelo* v. *Reeves,* 227 U. S. 625, 631.

The cause of action against the bankrupt on which this claim rests arose upon the performance of acts by him in his capacity as director in violation of his official duty. The breach of his contractual duty occurred at that time.

Damages for that breach of his contract by the bankrupt could have been liquidated under § 63b. The measure of damages was the amount of the loan authorized or ratified in breach of the bankrupt's duty less the value of what was received for it or the amount received thereon. The assess-

ment of damages involves no more of contingency than that held provable in *Central Trust Co.* v. *Chicago Auditorium,* 240 U. S. 581, 592, 593.

The bankrupt was acting as director and member of 'the executive committee. He was in fact an officer and liable as such, regardless of the regularity of his election. *Thayer* v. *New England Lithographic Co.* 108 Mass. 523, 527. *Hudson* v. *J. B. Parker Machine Co.* 173 Mass. 242, 246.

The damages have been liquidated by the finding of the master. The sum of $42,975.00 found to be due appears to have been reached according to correct principles. This is a proceeding in equity. The set-off may be established according to equitable principles even if not strictly within the letter of G. L. c. 232, § 1. *Merrill* v. *Cape Ann Granite Co.* 161 Mass. 212, 217. *Perry* v. *Pye,* 215 Mass. 403, 413, 414. *Cromwell* v. *Parsons,* 219 Mass. 299.

The defendant is entitled to the set-off because it is provable in its nature. Even if this claim against the bankrupt had been contingent at the time of the filing of the petition in bankruptcy and had since become liquidated, the defendant would be entitled to the set-off. The words respecting set-off in § 68b of the bankruptcy act, forbidding the allowance of any set-off or counterclaim " not provable against the estate " of the bankrupt, refer " to the nature of the claim at the moment when it was sought to set it off, not to its nature at the beginning of the pending bankruptcy proceedings." The case at bar upon this point also is governed by *Morgan* v. *Wordell,* 178 Mass. 350, 355.

It follows that the defendant is entitled to set off this claim.

## SECOND SUIT.

The second suit is by the trustee in bankruptcy to establish against the trust company a claim for $187,500, paid by the bankrupt in June, 1920, for fifteen hundred shares of new issue of capital stock of the trust company. The facts relevant to this case already have been stated in discussing the question whether the bankrupt was a stockholder of the

trust company with respect to the shares purporting to be a new issue of capital stock.

The master found that it did not expressly appear that the vote to increase the capital stock was passed by a majority of all the stock of the trust company as required by St. 1903, c. 437, § 40, G. L. c. 156, § 41, but in the absence of evidence to the contrary assumed such to be the fact. The burden was on the plaintiff to show the invalidity of the stock as alleged in its bill. If the fact, that such vote was passed by a majority of all the stock, ought to appear upon the records of the corporation, *American Tube Works* v. *Boston Machine Co.* 139 Mass. 5, 10, it is not shown that the corporate record was wanting in that particular. Hence that burden of proof is not sustained. Moreover, no exception was taken to the action of the master in making this assumption.

The chief basis for the allegations of the bill and for the exceptions to the master's report on this branch of the case rests on the failure by the corporation to comply with certain statutory requirements as to the increase of the amount of capital stock of a trust company. That requirement is in St. 1903, c. 437, § 41, now G. L. c. 156, § 43, incorporated by reference into St. 1905, c. 189, now G. L. c. 172, § 18. It has already been quoted in the opinion in the first case. It is in substance that within thirty days after the vote by the stockholders to increase the capital stock, a paper setting forth the amendment to its corporate articles wrought by such vote, signed by the president, treasurer and a majority of the directors, must be presented to the commissioner of corporations and certified by him as conformable to the requirements of law and then filed in the office of the secretary of the Commonwealth with a fee for recording. Confessedly no such paper was prepared, certified or filed. It further is provided by the statute that "No amendment or alteration of the agreement of association or articles of organization shall take effect until said articles of amendment shall have been filed in the office of the secretary of the Commonwealth." The contentions are, therefore, that the attempted increase of capital stock of the trust company was a nullity, that the pretended issue of certificates of stock for such increase was

utterly void, that the payment therefor made by the bankrupt to the trust company was wholly without consideration, and that the amount so paid constitutes a provable claim against the trust company in liquidation.

The facts are that a valid vote to increase the capital stock was passed by the stockholders, that the proposed increase of capital stock was approved by the commissioner of banks as required by the statute, that the increase of the capital stock was all paid in full in cash, that it was received by the trust company and was entered on its books as part of its capital, and that certificates of stock in due form were issued by the corporation. These are the matters of essence for the protection of depositors and other creditors. The trust company had the power under the law to increase its capital stock. It secured the approval of the bank commissioner, who for that purpose was the representative of the sovereign power. The entire increase was paid in cash. The record shows, not a lack of corporate power to increase the capital stock, but irregularities in the performance of some of the statutory forms not affecting the essential rights of the trust company, its creditors, or the subscribers for the new stock in their relations to each other. There is present the further fact that the bankrupt was a director and member of the executive committee of the trust company. The amount paid to the trust company for the new stock was treated by it and by the bankrupt as payment for capital stock. Capital stock of a corporation is a fund set apart in case of necessity for the payment of debts. Creditors have a right to look to it for the payment of their claims.

Any attempt by a corporation to issue stock in excess of the amount authorized by law is a nullity. *Allen* v. *South Boston Railroad*, 150 Mass. 200. *Smith* v. *Worcester & Southbridge Street Railway*, 224 Mass. 564. *Attorney General* v. *Massachusetts Pipe Line Gas Co.* 179 Mass. 15, 20, 21.

This is not a case of corporate inability on the part of the trust company to increase its capital stock, such as existed in *Scovill* v. *Thayer*, 105 U. S. 143, 149. The trust company had power to increase its capital stock provided there was compliance with the statute. There was observance of the

essential prerequisites to the lawful lodgment of payments for the increase of stock in the treasury of the trust company. There was failure of procedure in following that part of the statute which would have afforded accurate information on public record as to the increase of the stock. We do not overlook or narrow the imperative nature of the statutory requirement in that particular. We do not undertake to state its force and effect in other respects. But it relates to a matter which is not of substantial importance so far as concerns the trust company and the bankrupt in their present respective situations. The trustee of the bankrupt is estopped to rely upon that aspect of the statute in order to escape the obligations of a stockholder. *Chubb* v. *Upton,* 95 U. S. 665, 667. *Banigan* v. *Bard,* 134 U. S. 291. *Sanger* v. *Upton,* 91 U. S. 56, 64. *Casey* v. *Galli,* 94 U. S. 673, 680. *Handley* v. *Stutz,* 139 U. S. 417, 423, 426. *Scott* v. *Deweese,* 181 U. S. 202, 209. *Newcomb* v. *Reed,* 12 Allen, 362. *Walworth* v. *Brackett,* 98 Mass. 98. *Veeder* v. *Mudgett,* 95 N. Y. 295. *Winters* v. *Armstrong,* 37 Fed. Rep. 508, 517–520. The case at bar, for the reasons already stated, is distinguishable in its facts from *American Tube Works* v. *Boston Machine Co.* 139 Mass. 5, *Reed* v. *Boston Machine Co.* 141 Mass. 454, *Attorney General* v. *Massachusetts Pipe Line Gas Co.* 179 Mass. 15, and *Falmouth* v. *Falmouth Water Co.* 180 Mass. 325.

It follows that the entry in this suit must be,

*Decree to be entered dismissing bill.*

### THIRD SUIT.

This is a petition by the trustee in bankruptcy to establish his claim against the trust company in liquidation upon transactions with reference to the account of the bankrupt subsequent to the morning of August 10, 1920, when the account of the bankrupt was balanced on the books of the trust company. It has to do with the state of that account subsequent to the time at which ends the first of the suits here presented for decision.

Several groups of items relate to a debit balance and to

charges based on checks of the bankrupt certified by the trust company during the run on the bankrupt just prior to the filing of the petition in bankruptcy. These charges stand on the same footing as the overdraft of the bankrupt considered in the first suit. What there was decided disposes of this matter. For the reasons stated in the decision of the first suit, the trust company is not entitled to charge these debits against credits of the bankrupt. The account stated by the master must be modified accordingly.

One of the assets of the trust company when the commissioner of banks took possession of it was a demand note to its order for $10,000, dated June 30, 1920, made by one Bertoldi, related to the bankrupt by marriage. On September 1, 1920, the commissioner of banks demanded payment by letter directed to the maker, to which reply was received from the bankrupt stating falsely that he had already paid the note. In December, 1920, one of the then trustees of the bankrupt stated to an accountant employed by the commissioner of banks that the bankrupt recognized this note as his liability. In February, 1921, the trustees in bankruptcy notified the commissioner of banks that they claimed as assets any deposits standing to the credit of Bertoldi. Further facts have been stipulated by the parties as follows: " Bertoldi . . . signed this note at Ponzi's suggestion, and Ponzi had it discounted at the Hanover Trust Company. The proceeds were then applied with Bertoldi's approval to the purchase of a Ponzi note for $15,000 payable in ninety days. This note was in the usual form. On or about August 1 or 2 Bertoldi endeavored to get Ponzi to take back this note for $15,000 and repay him the $10,000 paid for the note in order that Bertoldi might pay his note at the Hanover Trust Company. Ponzi declined to do this, but suggested to Bertoldi that he sell the Ponzi note to some one else for $10,000, and said that if Bertoldi succeeded in doing this and would bring in the money, he, Ponzi, would pay Bertoldi's note at the Hanover Trust Company. Bertoldi succeeded in selling the Ponzi note for $10,000 and on August 6 gave the money to Ponzi, who then said that he had taken care of the Bertoldi note at the Hanover Trust Company and gave

Bertoldi a receipt, reading as follows: . . . ' Received from George Bertoldi the sum of ten thousand dollars ($10,000) in full payment of his note for the same amount to the Hanover Trust Co. and which was paid by me. Chas. Ponzi.' Neither party is able to state what disposition Ponzi made of the $10,000 thus paid to him by Bertoldi." This receipt was signed by the bankrupt.

On all these facts the trust company is entitled to offset this note. Its legal claim in the first instance was against the maker of the note. But the bankrupt, some time after the date of the note, received the money to pay the note from Bertoldi. That money was paid and received for the use of the trust company. It should be allowed to the trust company in a proceeding in equity such as is the case at bar. *Wickwire Spencer Steel Corp.* v. *United Spring Co.* 247 Mass. 565. The face of the note only is to be allowed, without interest. The accounts in a case like the present are to be adjusted as of the time when the commissioner of banks took possession of the trust company, without interest thereafter. *Commissioner of Banks* v. *Hanover Trust Co.* 247 Mass. 347, 349. *Cosmopolitan Trust Co.* v. *Suffolk Knitting Mills*, 247 Mass. 530.

The findings of the master in this suit are to stand save as modified by what has been said.

All questions which have been argued in this case are settled by what has been said. Those not argued, if not expressly waived, are treated as waived.

Decree is to be entered in accordance with the principles here declared. We do not pause to make the arithmetical calculations. The details are to be fixed by a single justice.

*So ordered.*