COMMISSIONER OF BANKS *vs.* TREMONT TRUST COMPANY
& others.

Suffolk.   November 29, December 7, 1926.— April 6, 1927.

Present: RUGG, C.J., BRALEY, CROSBY, PIERCE, & SANDERSON, JJ.

*Trust Company*, Stockholders' liability, Increase of capital stock, Fraud of officers.   *Estoppel.   Infant.   Trust*, Trustee's liability as stockholder in trust company.   *Corporation*, Ultra vires, Officers and agents, By-laws.   *Executor and Administrator.*

In a suit by the commissioner of banks, under G. L. c. 167, § 24; c. 172, § 24, to charge individuals as stockholders of a trust company to the amount of the par value of their shares, those defendants who have subscribed for an increase of stock within the power of the corporation to make, who have received and accepted certificates of stock issued to them, and whose names thus have been entered on the books of the corporation as stockholders, who have collected and kept dividends on such stock, and who have acted as stockholders directly or indirectly in the management of the corporation, will not be heard to defeat such an action on the ground that the stock was increased in an irregular and unlawful manner.   Following *Commissioner of Banks* v. *Cosmopolitan Trust Co.* 253 Mass. 205.

Defendants in such a suit cannot escape liability in such circumstances, although it appears that special meetings at which the increases of capital stock were voted were not properly called, that at such meetings a majority of all the stock was not cast for the increase, that the secretary of the company made a false record to the effect that a majority of all the stock was present and had voted for the increase of capital stock, and there was no finding nor evidence that the defendants voted directly or by proxy at stockholders' meetings, or otherwise acted directly or indirectly in the management of the corporation, or even ever executed a proxy or in any way consciously acted like stockholders beyond accepting certificates and receiving in some instances quarterly dividends in ignorance of the illegality of the issue of the stock and without any means open to them to learn of its invalidity; and it further appears that the defendants believed that, in accepting the dividend checks, they represented duly declared dividends on stock lawfully issued to them, and that they received the checks without any knowledge of the insolvency of the bank or that the methods adopted by the officers of the bank in the increase of the capital stock were irregular; and no evidence was offered that any depositors or creditors were aware that the defendants were stockholders or became such because of the fact that the defendants or any of them were stockholders.

A defendant in such a suit could not escape liability on the ground that when a minor he received his stock as a gift from his father, if it appears that after he became of age he accepted dividends upon the shares.

A defendant in such a suit could not escape liability merely on the ground that the shares of stock, as to which it was sought to charge him, stood in his name as trustee for a minor child.

Certain of the defendants in the suit above described, for the accommodation of the trust company and at the request of its treasurer, executed and delivered their several promissory notes, payable to the trust company, in amounts representing the supposed value of certain certificates of the new issues of stock which were issued to them individually, and each indorsed the certificate or signed the stub of the certificate and left it and the signed note with the treasurer of the trust company. To some of them no certificate was issued; certificates were delivered to others of them, but none of them regarded the transaction as a sale. Immediately previous to the closing of the trust company, notes of some of them were returned to them with statements by officers of the trust company that the commissioner of banks objected to sales of stock for notes. All of them had received dividends except one to whom no certificate had been issued and whose note had not been returned. *Held,* that

    (1) The several defendants were stockholders when the trust company was closed, and it was immaterial whether they were honestly such or were such to assist the officers of the trust company in their successful attempt to deceive the commissioner of banks and thereby obtain his approval of the capital increase;

    (2) The cancellation of the transactions by the trust company just previous to its closing was too late to relieve the defendants from the obligations which attached to the ownership of the stock, held by them under an agreement with the officers of the trust company which was a fraud on the creditors of the bank as well as upon the commissioner of banks;

Defendants, in the suit above described, who had received and cashed dividend checks could not avoid liability by contending that the stock standing in their respective names was issued without their request, or that it remained standing in their respective names after they had informed the treasurer that they did not desire to purchase any stock.

A defendant in the suit above described had lent his certificate to a third party for use in obtaining a loan, and the third party had exchanged the certificate for one in his own name, but had not used the new certificate to obtain a loan or otherwise, and had not transferred the stock to the original owner when the commissioner took possession of the bank. *Held,* that the original owner was the real owner for the purposes of the suit, although he was not the registered owner.

A defendant, in the suit above described, was the widow and administratrix of the estate of a holder of shares of the first issue who had died intestate more than two years before the commissioner had taken possession of the property and business of the trust company. She had filed an account in which she charged herself with the shares, and the account was allowed without further accounting and without an order for dis-

tribution. She had distributed the assets of the estate except the shares in question, retaining one third of the assets for herself. She still retained the original certificate. *Held*, that the estate was unsettled and that the administratrix must be held to respond to the suit of the commissioner to the extent of the estate which came to her as administratrix, undiminished by her voluntary distribution of it.

A Massachusetts corporation was organized "to manufacture, etc. and otherwise deal in leather and any and all other merchandise and commodities of whatever nature and character, more particularly but not in any wise as a limitation upon the foregoing. To subscribe for, purchase, invest in, etc. or otherwise dispose of shares of capital stock, etc." At the time the bank commissioner took possession of the property and business of the trust company, in the circumstances above described, the corporation was a shareholder, and as a shareholder became a defendant in the suit. It had been a depositor in the trust company and its treasurer had paid for its shares of stock by a corporation note, which had been paid. It had received dividends on the stock. *Held*, that a contention, that recovery against the corporation was precluded because the transaction was *ultra vires*, was without merit both because the transaction was within the corporation's charter powers and because the transaction had been completed.

A bank, which was a defendant in the suit above described, twenty days before the commissioner of banks took possession of the property and business of the trust company, had delivered a certificate representing shares of the trust company held by it indorsed in blank to a stockbroker, who had sold it to one, who was then chief executive and had the general management of the trust company and who handed it to the treasurer of the company. The stockbroker delivered to its customer, the bank, the amount the certificate sold for less transfer stamps and commission. One share from the certificate had been transferred to a third party before the commissioner took possession. The bank had not complied with a requirement of the by-laws of the trust company that notice by a stockholder desiring to sell his stock should be given to the board of directors "that he will sell such shares to any member of the Board of Directors of this corporation who may desire to purchase the same at a price not to exceed the book value thereof." There was nothing to show that the directors had waived such notice. *Held*, that, there being nothing in the attendant circumstances to justify a finding that the bank did all it reasonably could to divest itself of its title to the stock, the bank remained liable as a stockholder.

The president of a bank purchased one hundred and thirty-three shares of a trust company, and the certificate in the bank's name was delivered by him to its treasurer, who listed it as an asset of that company and put it in its vault with other securities belonging to it. There did not appear to have been any formal approval of the transaction by the financial and the investment committees of the bank, but there was evidence that the treasurer frequently paid out large sums of money, sometimes as large as $20,000, on the order of the president without consulting any other officer of the bank. The bank received dividends on the stock. *Held*, that

(1) The acts of the president of the bank in excess of his authority, although voidable by the corporation, legally could be ratified and adopted by it, and the acceptance of dividends warranted an inference of such ratification and adoption;

(2) The bank could not accept the benefits of the executed contract and thereafter, on the ground that it was *ultra vires* or because it was beyond any power conferred by the defendant upon its president, avoid liability as an owner of stock of the trust company.

BILL IN EQUITY, filed in the Supreme Judicial Court for the county of Suffolk on May 8, 1923, and afterwards amended, against four hundred eleven alleged stockholders of the Tremont Trust Company to enforce stockholders' liability.

The suit was referred to a master. Material findings by the master are stated in the opinion. The suit was reserved by *Sanderson*, J., for determination by the full court.

*C. F. Rowley*, for the plaintiff.

*E. Greenhood*, for Black and others, defendants.

*S. L. Bailen*, for Old South Trust Company, defendant.

*J. F. O'Connell*, for Marr, defendant.

*C. T. Cottrell*, for Innes; *S. Parsons & E. Parsons*, for Bremner, administratrix; *H. Goldkrand & L. Goldkrand*, for Rudnick and for Rosen; *T. F. McAnarney & G. Holland*, for Metropolitan Trust Company, submitted briefs.

PIERCE, J. This is a suit by the commissioner of banks of the Commonwealth of Massachusetts, in possession of the property and business of the Tremont Trust Company, acting in pursuance of the authority conferred on him under G. L. c. 167, § 24, to charge the individual defendants as stockholders of the Tremont Trust Company under G. L. c. 172, § 24, to the amount of the par value of their shares. Upon the completion of the pleadings, the case was referred to a master, who heard the parties and made his report, and it comes before this court by reservation upon the pleadings, the master's original and supplemental reports, the exceptions thereto, and the stipulation of the plaintiff that "any defence which, if pleaded, would be open to any defendant may be considered as having been pleaded by him."

The main facts pertinent to the issues common to all the defendants are in substance as follows: The Tremont Trust

Company was organized in August, 1914, "to do a general trust company and banking business." It conducted a commercial and a savings department. It continued active operation until February 17, 1921, when the bank commissioner, acting under G. L. c. 167, § 22, took possession of its property and business and has since retained such possession and is liquidating its affairs. It was and is hopelessly insolvent. On March 24, 1922, a creditor of the Tremont Trust Company obtained judgment against the trust company in the sum of $1,110.09, and on March 25, 1922, an execution issued from the Municipal Court of the City of Boston for the sum of $1,110.09 and costs in the sum of $15.15, a total of $1,125.24 which was returned to court in no part satisfied. On October 26, 1922, an alias execution issued which was returned with an indorsement of the deputy sheriff to whom it was committed, in substance, that upon demand made upon the defendant it neglected for more than thirty days after demand to pay the amount due on the execution with the officer's fees, or to exhibit to him real or personal property of the debtor corporation subject to be taken on execution sufficient to satisfy the same, and that the execution was returned in no part satisfied.

On March 1, 1922, the commissioner of banks determined that it was necessary to enforce the individual liability of the stockholders of the Tremont Trust Company to the extent of one hundred per cent of the par value of the stock held by them; and by letter dated March 1, 1922, so notified the stockholders of record as of February 17, 1921. At the time of its organization in August, 1914, the trust company had a capital stock of $200,000 divided into two thousand shares with a par value of $100 per share. These two thousand shares are referred to by the master as the first issue, and no question is raised as to their legality. On September 12, 1919, steps were taken to increase the capital stock from $200,000 to $800,000; this is referred to by the master as the second issue. On May 7, 1920, steps were taken to increase the capital stock from $800,000 to $2,000,-000; this is referred to by the master as the third issue. The

defendants contest the legality of and their liability on the second and third issues of stock.

The master found in substance that notices of the special meetings of September 12, 1919, and of May 7, 1920, at which the alleged increases of capital stock were supposed to have been authorized, were "not mailed or otherwise given to all the stockholders of record prior to the respective dates of said meetings"; that less than a majority in number of shares then outstanding voted for the increases from $200,000 to $800,000 and from $800,000 to $2,000,000; "that the records of the special meetings of September 12, 1919, and of May 7, 1920, respectively, were inaccurate and untrue"; that the statements in the letter of January 13, 1920, to the bank commissioner, to the effect that the authorized increase in the capital stock in the sum of $100,000 has been fully subscribed for and "there has already been issued and paid in thereon six hundred and two shares," and the statements in the letter of March 22, 1920, that "The authorized increase in our capital stock in the sum of $200,000 has already been subscribed for," and in the letter of June 28, 1920, were not true and were intended to deceive the bank commissioner; that the greater portion of the second and third issues of stock were not issued for cash as required by law, but were paid for by money loaned by the bank on promissory notes for the purpose of enabling the subscribers to pay for the stock, by part cash and part promissory notes, or without any consideration whatsoever.

The master also found that false and misleading statements as to the financial condition of the trust company were made by the officers of the trust company to a large number of the defendants, "to induce them [the defendants] to purchase the stock; that these defendants relied on said representations and were thereby induced to purchase; and that they did not learn of the falsity of the representations until after the closing of the bank." "The particular representations made to these defendants varied in each case. The substance of the representations was that the bank had earned large profits and was in a flourishing condition; that

the stock was actually worth more than $200 per share; and that the bank commissioner ordered an increase in the stock because of the enormous business that was being done by the bank."

The master further found "that until after the closing of the bank none of the defendants knew, nor from an examination of the records of the corporation could ascertain, that the officers of the bank did not take the proper legal steps necessary to enable it to increase its capital stock on either occasion"; "that in accepting the dividend checks the defendants believed that they were duly declared dividends on stock lawfully issued to them and received them without any knowledge of the insolvency of the bank, or that the methods adopted by the officers of the bank in the increase of the capital stock were irregular"; and "that after the closing of the trust company all the defendants, except as herein otherwise stated, declared their intentions to rescind their subscriptions and offered to return the stock certificates, with the dividends received by them and interest thereon, to the commissioner of banks, and that the commissioner refused such tender."

At the request of counsel for the defendants the master found "(a) That at no time during the year 1920 or 1921 was any record of the stockholders of the Tremont Trust Company open to inspection by the depositors in said trust company, or the public; (b) That no evidence was offered that any of the depositors or creditors of the Tremont Trust Company were aware that the respondents were stockholders; (c) That none of them became depositors or creditors because of the fact that the respondents or any of them were stockholders; [and] (d) That none of the defendants knew of the falsity of the letters written to the commissioner of banks by the officers of the trust company in connection with the increase of the capital stock from $200,000 to $800,000 and from $800,000 to $2,000,000."

On the other hand, the master finds that the defendants intended to become stockholders; that substantially all of them received one or more dividends on their stock; and that the assets of the bank purported to be increased by the

amount of their payments for stock, whether such payments were made by cash, notes or otherwise.

It is settled by the decision in *Commissioner of Banks* v. *Cosmopolitan Trust Co.* 247 Mass. 334, 342, that the commissioner of banks has the "power to determine whether to enforce the liability of stockholders and the power to decide finally the amount of such liability to be enforced, up to the full limit permitted by the statute"; and that "The question of the necessity of enforcing the liability of stockholders and the extent to which that liability shall be enforced are not open further to judicial inquiry in a proceeding to enforce that liability." And it was determined in *Scovill* v. *Thayer*, 105 U. S. 143, 149, that "a stockholder cannot set up informalities in the issue of stock which the corporation had the power to create." As was said in *Commissioner of Banks* v. *Cosmopolitan Trust Co.* 253 Mass. 205, 218, quoting from *Scovill* v. *Thayer, supra,* "A distinction must be made between shares which the company had no power to issue and shares which the company had power to issue, although not in the manner in which, or upon the terms upon which, they have been issued." Based upon the facts found by the master in relation to the manner in which the officers of the Tremont Trust Company obtained the approval of the commissioner of banks to the increase of the capital stock of the trust company, the defendants, relying upon the cases of *American Tube Works* v. *Boston Machine Co.* 139 Mass. 5, 11, *Attorney General* v. *Massachusetts Pipe Line Gas Co.* 179 Mass. 15, 20, *Falmouth* v. *Falmouth Water Co.* 180 Mass. 325, 330, and *Cunningham* v. *Commissioner of Banks,* 249 Mass. 401, 421, submit "that the Tremont Trust Company neither has, nor can have, an increase in its capital stock until the increase is authorized by the bank. commissioner, who has jurisdiction in the premises." And they further contend, as a corollary thereto, that the defendants are not estopped to set up the invalidity of the second and third issues of the stock of the trust company. That there was no valid issue of capital stock the defendants contend is established by the alleged fact that the approval of the issues by the commissioner of banks was obtained on each occasion

by the exhibition of false records, by false statements as to prior subscriptions and sales and that his own written conditions as to sale and payment had been fulfilled, and particularly on the false statement that the second issue had been fully sold and for cash.

Whatever power, if any, the commissioner of banks, deceived by the false statements, had to withdraw his approval, it is indisputable that the second and third issues of capital stock were in fact issued with his approval. The defendants, however, contend that the approval was without effect because notices of the respective special meetings of the stockholders of September 12, 1919, and of May 7, 1920, were not given as required by St. 1903, c. 437, § 40, (G. L. c. 156, § 41); that less than a majority of the shares outstanding and entitled to vote voted for the increase, St. 1903, c. 437, § 40, (G. L. c. 156, § 41); that sales of the stock were not made within the time limited by the commissioner, St. 1916, c. 37, § 1, (G. L. c. 172, § 18); that the shares were not paid for in cash and were disposed of by the officers of the company, contrary to the resolutions adopted by the executive committee which had been authorized by the stockholders to sell the stock, thus violating the requirements of St. 1903, c. 437, § 40, (G. L. c. 156, § 41). For similar reasons the defendants contend that the purported increase of the capital stock known as the third issue was not duly voted by the stockholders as required by law. St. 1920, c. 349, § 6, (G. L. c. 156, § 41).

The first question for decision is, assuming the trust company had the power to increase its capital stock, St. 1916, c. 37, (G. L. c. 172, § 18) has it exercised that power in conformity to the essential and substantial requirements of the statute, it being settled that a corporation has no implied power to change the amount of its capital as prescribed in its charter and that all attempts to do so are void. *Scovill* v. *Thayer, supra. Cunningham* v. *Commissioner of Banks, supra,* at page 428.

St. 1916, c. 37, reads: "Any trust company desiring to increase its capital stock to an amount greater than that fixed in its agreement of association . . . may, subject to

the approval of the bank commissioner, increase its capital stock in the manner provided for the increase of capital stock of business corporations under" St. 1903, c. 437, (G. L. c. 156, § 41) which reads: "Every corporation may, at a meeting duly called for the purpose, by the vote of a majority of all its stock . . . entitled to vote, authorize an increase . . . of its capital stock and determine the terms and manner of the disposition of such increased stock." The master finds that notices of the special meetings of the stockholders of September 12, 1919, and of May 7, 1920, were not mailed or otherwise given to all the stockholders prior to the respective dates of said meetings; and further finds that less than a majority in number of shares then outstanding voted for the respective increases from $200,000 to $800,000, and from $800,000 to $2,000,000, that is, for the second and third issues of stock. The special meetings called without notice, by mail or otherwise, to stockholders of the object of the meetings, and the votes at these meetings of less than a majority of stock outstanding and entitled to vote to increase the capital stock to $800,000 and $2,000,000, respectively, were illegal. *Wiggin* v. *Freewill Baptist Church in Lowell,* 8 Met. 301. *Stebbins* v. *Merritt,* 10 Cush. 27, 33. *Sabourin* v. *Lippe,* 195 Mass. 470, 479. *Cunningham* v. *Commissioner of Banks, supra. Commissioner of Banks* v. *Cosmopolitan Trust Co.* 253 Mass. 205, 218, 219, 225.

Assuming the trust company had the power, as in this case, to issue the second or third issues of stock and failed to take the steps, pursuant to which the increase could lawfully be made, and creditors could without fault believe that the increase had been lawfully effected and the necessary steps had been taken, the question is, Are the defendants, whose names appeared on the books of the Tremont Trust Company as holders of shares of the second or third issues of stock on the day the bank was closed as an insolvent institution, liable to any extent or for any purpose to the commissioner of banks as the representative of the creditors of the trust company, because of their acceptance of the increased stock or by taking dividends upon it? The answer is found in *Commissioner of Banks* v. *Cosmopolitan Trust*

*Co.* 253 Mass. 205, at pages 219, 220, where it is said: "The true rule is, when action is brought in behalf of creditors by the representative of an insolvent financial corporation, like a bank or trust company organized and conducted for the purpose of soliciting and receiving deposits from the public, to enforce the statutory liability of its stockholders, that those, who have subscribed for an increase of stock within the power of the corporation to make, who have received and accepted certificates of stock issued to them, and whose names thus have been entered on the books of the corporation as stockholders, who have collected and kept dividends on such stock, and who have acted as stockholders directly or indirectly in the management of the corporation, will not be heard to defeat such an action on the ground that the stock was increased in an irregular or unlawful manner."

The force of the rule and its applicability to the case at bar are not lost, as the defendants contend, because of the facts that the special meetings were not duly called; that at the meetings a majority of all the stock was not cast for the increase; that the secretary of the company made a false record to the effect that a majority of all the stock was present and had voted for the increase of capital stock; that there is no finding by the master or evidence that the defendants voted directly or by proxy at stockholders' meetings, or otherwise acted directly or indirectly in the management of the corporation, or even ever executed a proxy or in any way consciously acted like stockholders, beyond accepting certificates and receiving in some instances quarterly dividends in ignorance of the illegality of the issue of the stock, and without any means open to them to learn of its invalidity; that the defendants believed that, in accepting the dividend checks, they were duly declared dividends on stock lawfully issued to them and received by them without any knowledge of the insolvency of the bank, or that the methods adopted by the officers of the bank in the increase of the capital stock were irregular; and that no evidence was offered that any depositors or creditors were aware that the defendants were stockholders or became such because of the fact that the defendants or any of them were stockholders.

Other facts, similar to the above stated facts, were present in the case of *Commissioner of Banks* v. *Cosmopolitan Trust Co.* 253 Mass. 205, and were referred to in support of the rule by way of argument; but their presence or absence singly or in the aggregate was not a condition of fact without which the rule could not exist as formulated. It was said in that case at page 221 that, "The defendants, in becoming subscribers to the stock of the trust company, must be presumed to know the common customs of business touching such a matter. The executive officers of such a company would naturally spread the information by conspicuous and widely known means that its financial resources and responsibility had been enlarged by such increase of capital stock. Whether they did in fact need not be inquired. The public would be likely to rely upon notorious and unchallenged statements in giving credit to the institution on the faith of its larger assets. Inducement of particular individuals to become creditors of the trust company on the strength of such increase hardly could be shown by specific testimony. No direct evidence commonly would be required to the point that people would trust an association with $600,000 of paid up capital rather than one with $200,000 if other factors of credit were the same. The circumstance that the public records did not disclose the increase of capital stock in this connection is not of decisive significance." And at page 225 it was decided that a defendant who did not learn of the falsity of representations made to induce him to purchase the stock of the bank until after the closing of the bank because of its insolvency cannot thereafter exercise the right of rescission and avoidance of his subscription because of fraud. See collection of authorities to same effect, 41 Am. L. R. 674.

We proceed to consider the special defences of the several defendants in so far as they are presented by briefs.

At the hearing in this court the plaintiff stated that the bill should be dismissed as against Muriel Goldberg and Lawrence Laskey, who pleaded infancy and were found by the master to be still below majority. A decree is to be entered dismissing the bill as to these defendants, with costs.

. The defence of minority is not open to Henry M. Rittenberg, who received stock as a gift from his father on January 23, 1920, became of age on July 29, 1920, and received dividend checks after he reached his majority.

The defendants Samuel Berger, Anthony Musolino, Aaron Hailparn, Victor Kaufman, Aaron Levinson and Meyer J. Sawyer hold certificates of stock, which stand in their respective names as trustees for their minor children, and some of them have received dividend checks and cashed them. These defendants are the legal owners of the stock, and are plainly liable to the same extent as are individuals holding stock in their own right free from any trust. *Commissioner of Banks* v. *Cosmopolitan Trust Co.* 253 Mass. 205, 218. *Flynn* v. *American Banking & Trust Co.* 104 Maine, 141. It may also be that the real owner of the shares can be treated as the shareholder. *Pauly* v. *State Loan & Trust Co.* 165 U. S. 606, 619, 620.

The defendants Maurice Palais, Simon J. Dangel, Frederick A. Junisky, Louis M. Krasnoo, Samuel C. Mintz, John D. Marr, and Alexander McGregor, for the accommodation of the bank at the request of its treasurer, Benjamin H. Swig, executed and delivered their several promissory notes, payable to the bank, in amounts representing the supposed value of certain certificates of second or third issues of capital stock which were issued to them individually. Each of them indorsed the certificate or signed the stub of the certificate and left it and the signed note with the treasurer of the bank. No certificate was delivered to Marr, Palais or Dangel. At the time the certificate was issued in the name of Mintz or of Krasnoo or of Junisky, none of them regarded the transaction as a sale. Immediately prior to the closing of the bank the notes of Dangel, Junisky, Krasnoo and Mintz were returned to them by the treasurer, with the statement "that the commissioner of banks objected to the sale of stock by notes and he was therefore obliged to cancel the transaction"; or "that the commissioner of banks ordered the officers of the bank to return all notes given in payment of stock and that said certificate had been cancelled." With the exception of Marr, each of these defendants received

dividend checks declared on the stock held by them, which were credited to their several accounts and charged off as interest on their several notes. Upon these facts it is plain the several defendants were stockholders when the bank was closed, and it is quite immaterial whether they were honestly such or were such to assist the officers of the bank in their successful attempt to deceive the commissioner of banks and thereby obtain his approval of the capital increase. The cancellation of the transactions by the bank on the day of its closing was too late to relieve the defendants from the obligations which attached to the ownership of the stock held by them under the agreement with the officers of the bank, which was a fraud on the creditors of the bank as well as upon the commissioner of banks. "The question as to the liability of the defendants as stockholders is not raised by the corporation, or by public officers enforcing regularity of corporate conduct, or by other stockholders. It is not raised on their own initiative in proceedings against a going concern directly instituted to relieve themselves of a fraud practised on them. It is presented after the insolvency of that concern as a defence in an action to enforce a liability in behalf of beneficiaries for whom the General Court has undertaken to establish an exceptional protection." *Commissioner of Banks* v. *Cosmopolitan Trust Co.* 253 Mass. 205, 221.

The defendants Gabe Rosen and Samuel Rudnick claim that the stock standing in their respective names was issued without their request or remained standing in their respective names after they had informed the treasurer that they did not desire to purchase any stock. In each instance the master finds that dividends were declared on the stock so issued and that the checks therefor were cashed by the defendants. The evidence of an accepted ownership of stock which arose from the receipt of dividends was ample.

The defendant Charles H. Innes, owner of a certificate for ten shares of stock, lent it to one Roscoe A. Smith for use in obtaining a loan. Smith exchanged the certificate for one in his own name, but did not use the new certificate to obtain a loan or otherwise, and had not retransferred the stock to Innes when the commissioner took possession of the bank.

Innes in the circumstances was the real owner of the shares of stock although he was not the registered owner. In *Pauly* v. *State Loan & Trust Co., supra*, a case involving the liability of shareholders to creditors under U. S. Rev. Sts. § 5151, it was said at page 614, citing *National Bank* v. *Case*, 99 U. S. 628, "that a transfer on the books of the bank is not in all cases enough to extinguish liability"; one limit to that liability is "that the transfer must be out and out, or one really transferring the ownership as between the parties to it." In the case at bar Smith was bound to retransfer the stock when requested, and all the privileges and possible benefits of ownership continued in Innes. In *Rankin* v. *Fidelity Ins., Trust & Safe Deposit Co.* 189 U. S. 242, at page 252, it was held that the real owner might be charged, although his name never appeared upon the books of the bank. *Ohio Valley National Bank* v. *Hulitt*, 204 U. S. 162, 167, 168. The plaintiff "elects to hold the respondent Innes" and consents that the bill be dismissed against Smith. And the order of the court is that the bill be dismissed as against Roscoe A. Smith, with costs.

Alexander F. Bremner died January 8, 1919, the owner of twenty-five shares of the first issue of the stock of the Tremont Trust Company. His widow was appointed administratrix of his estate on January 10, 1919. She filed an inventory which included the shares of stock in question. Her first account, covering the period from January 10, 1919, to January 1, 1920, in which she charged herself with the shares, was filed October 8 and was allowed October 14, 1920, without further accounting and without an order for distribution. Excepting the twenty-five shares of stock in question, she distributed the assets of the estate among the children of the intestate, retaining one third of the estate for herself. She still retained the original certificate. In substance it was held in *Commissioner of Banks* v. *Hanover Trust Co.* 247 Mass. 347, that an administratrix as holder of the legal title and in that capacity was liable to the assessment decided upon by the commissioner of banks. The estate in the case at bar is an unsettled estate, and the administratrix is held to respond to the suit of the commis-

sioner to the extent of the estate which came to her as administratrix, undiminished by her voluntary distribution of it. *S. S. Pierce Co.* v. *Fiske,* 237 Mass. 39, 41.

The defendant Way Leather Company, a corporation organized April 17, 1917, under the laws of Massachusetts "to manufacture, etc. and otherwise deal in leather and any and all other merchandise and commodities of whatever nature and character, more particularly but not in any wise as a limitation upon the foregoing. To subscribe for, purchase, invest in, etc. or otherwise dispose of shares of capital stock, etc.," carried large deposits in the Tremont Trust Company. On February 3, 1920, its treasurer, Edward Cohen, who was also the owner of two thirds of its stock, was induced by the false representations above set forth of Benjamin H. Swig, the treasurer of the Tremont Trust Company, to purchase twenty shares of stock of the trust company. The stock was issued in the name of the corporation. Cohen signed the stub and received the certificate. In payment thereof he gave the note of the Way Leather Company for $2,600. This note has been paid and the corporation has received the dividends declared on the stock.

The defence of this corporation is that the purchase of the stock was *ultra vires,* in that the holding of stock in another company was foreign to the purpose for which the corporation was organized, was not incidental to its business of manufacturing or otherwise dealing in leather and other merchandise and commodities, and that the acquisition of the stock by the corporation under the circumstances was a perversion of the powers granted it. The answer to this objection is that the corporation was specifically authorized by its charter to "subscribe for, purchase, invest in . . . or otherwise dispose of shares of capital stock." As a strict business proposition it is obvious that it might be a distinct advantage to the corporation to own stock in the trust company where it banked and carried large deposits. Moreover, the contract relating to this stock has been fully executed by the corporation, and a dividend on the shares has been received and retained by it. *Nowell* v. *Equitable Trust Co.* 249 Mass. 585.

The defendant Metropolitan Trust Company was the owner of fifty shares of stock represented by certificate No. 826, and it received two dividends thereon. It relies upon the defences which are referred to as common to all defendants, and more specifically upon the fact found by the master that its vice-president on January 28, 1921, delivered the certificate indorsed in blank to one Zenas Crocker, Jr., a stock broker, who sold it to Simon Swig* at the Tremont Trust Company for $6,250, and he, in turn, handed it to the treasurer of the trust company. On the same day Crocker gave his firm's check to the Metropolitan Trust Company for $6,223 — the amount the certificate sold for less transfer stamps and commission. No transfer was made on the books of the trust company to Simon Swig. The stub of the stock books shows that on February 15, 1921, one share of stock was transferred to one Green, with the notation on the stub that it was taken from certificate No. 826, but there is no record on the books of the trust company showing what disposition, if any, was made of certificate No. 826.

In reference to the delivery of the certificate of stock No. 826 to Simon Swig or to the treasurer, Benjamin H. Swig, through Crocker, the master finds specifically that the Metropolitan Trust Company did not comply with the provision of Article X of the by-laws of the trust company which requires, in substance, that a stockholder desiring to sell his stock "shall give notice in writing to the Board of Directors . . . that he will sell such shares to any member of the Board of Directors of this corporation who may desire to purchase the same at a price not to exceed the book value thereof"; this by-law also provides that "No sale of any of the shares of this corporation shall be valid or shall pass title thereto unless and until all the preceding conditions and requirements have been fully complied with to the satisfaction of the Board of Directors of this corporation, but the issuance of a new certificate of stock shall be conclusive evidence that all the preceding conditions and requirements have been fully

---

*The master found that "Simon Swig was chief executive officer and had the general management of the bank throughout its existence until its close on February 17, 1921."

complied with to the satisfaction of the Board." These provisions as to the sale of stock were on the back of the certificate of stock. There is nothing in the record or in the report of the master to support the contention that the defendant complied with Article X, *supra,* or that the board of directors waived the benefits of the provisions of that article; and there is nothing in the attendant circumstances to justify a finding that this defendant did all it reasonably could to divest itself of its title to the stock. It follows that the defendant remained liable as stockholder. *Commissioner of Banks* v. *Cosmopolitan Trust Co.* 253 Mass. 205, 227.

As against the Old South Trust Company the material facts of the report disclose that its president, without consultation with the board of directors, was induced by Simon Swig, vice-president of the Tremont Trust Company, to buy one hundred and thirty-three shares of stock of that company for the Old South Trust Company. Thereupon, certificate No. 817 for one hundred and thirty-three shares was issued to the Old South Trust Company and delivered to its president. This certificate was handed to the treasurer of the defendant company, was listed by him as an asset of that company and put in the vault with other securities belonging to the defendant. Two dividends thereon "were received and cashed" by the defendant. The records of the directors and of the finance and investment committees during 1920 do not disclose any reference to or approval of the purchase of one hundred and thirty-three shares of stock of the Tremont Trust Company, but "There was . . . evidence that the treasurer frequently paid out large sums of money, sometimes as large as $20,000, on the order of McVey [the said president] without consulting any other officer of the bank." Upon the master's findings it is plain that the president of the defendant corporation with the assent, certainly without the dissent, of the officers of the corporation, assumed authority to deal with the financial affairs of the corporation. While his office as such conferred upon him no authority to purchase the stock on behalf of the corporation, such act of his was not illegal in the sense that it was violative of the common or statutory law. His acts in excess of his author-

ity, although voidable by the corporation, legally could be ratified and adopted by it, and the acceptance of dividends furnishes a reasonable inference that this was done.   See *Glovin* v. *Eagle Clothing Co. Inc.* 247 Mass. 215.   The defendant could not accept the benefits of the executed contract and thereafter avoid it on the ground that it was *ultra vires* or because it was beyond any power conferred by the defendant upon its president.   When a corporation enters into an *ultra vires* contract and receives the benefit of the contract, it cannot set up the defence of *ultra vires* to escape liability thereon.   "If the defendant has gone beyond the scope of its corporate powers, the remedy must be found in action to be taken by the public authorities or by the individual members of the corporation according to the nature of the case."   *Council of Jewish Women* v. *Boston Section Council of Jewish Women,* 212 Mass. 219, 223.   *Chester Glass Co.* v. *Dewey,* 16 Mass. 94.   *Charles River Bridge* v. *Warren Bridge,* 7 Pick. 344; affirmed in 11 Pet. 420.   *Charitable Association in Granville* v. *Baldwin,* 1 Met. 359.   *Slater Woollen Co.* v. *Lamb,* 143 Mass. 420.   *Kelly* v. *Biddle,* 180 Mass. 147.   *Nantasket Beach Steamboat Co.* v. *Shea,* 182 Mass. 147.

All questions raised by the exceptions of any defendant and every defence relied on in the several briefs have been considered, if not fully treated, in this opinion, and no reversible error is found.   It results that the master's reports are to be confirmed; a final decree is to be entered in general for the plaintiff against all the defendants, except such as to whom the bill has been discontinued or who are admittedly not liable, *supra;* the several defendants are to pay the full amount of the assessments due from them as appears by the master's main and supplemental reports, with interest thereon from March 1, 1922, the details to be settled by a single justice.

*Ordered accordingly.*