# WILDE, STATE EXAMINER v. ZIMMERMAN; SAME v. DOUGLAS SECURITIES COMPANY; SAME v. DOUGLAS RESERVOIRS COMPANY

(Nos. 1827; 1828; 1829; March 13, 1934; 30 Pac. (2d) 148)

For the plaintiff in error in each case, there was a brief and an oral argument by *R. R. Rose* of Casper, Wyoming.

532

For the defendant in error in each case, there was a brief and oral argument by *Joseph Garst* of Douglas. Wyoming.

534

BLUME, Justice.

A. E. Wilde, State Examiner, in charge of the First State Bank of Douglas, brought three actions, namely one against C. D. Zimmerman to recover on a note of seven thousand dollars, another against the Douglas Securities Company to recover on a note of ten thousand dollars, and another against the Douglas Reservoir Company to recover on a note of ten thousand dollars, the various notes being dated January 10, 1929, due in six months after date. Zimmerman was vice president of the two companies herein named and in each of these actions the defense was set up that certain bonds of Casper Improvement District No. 4, of the par value of $28,000, then held by the bank as collateral, were sold to the bank a few days after January 10, 1929, and that by reason thereof the notes sued upon were satisfied. In view of this common defense the three cases were consolidated and tried as one action. The court found in favor of the defendants, and the State Examiner has appealed to this court.

1. It is assigned as error that the judgment is not supported by sufficient evidence, and, particularly, that no contract has been shown, in that no acceptance of the offer to buy the bonds appears herein. The notes in suit were renewals of previous notes which became due on January 10, 1929. On or about that date Zimmerman went to the bank, pursuant to a notice, for the purpose of obtaining an extension of the indebtedness. He dealt with Mr. Huie, who at that time was president and general manager of the bank, and who then indicated

to Zimmerman, as the latter testified, that unless the bank could get more of the business of the defendants, the directors would be reluctant to continue to carry the full amount of the indebtedness. The testimony further shows that Zimmerman then stated, that in such case, it would be necessary for him to sell some of the bonds or some sheep; that thereupon Huie said: "We will buy the bonds," at first offering to do so at 98 cents on the dollar; but that, after further discussion, he finally made a definite offer to buy them at around 95½ cents on the dollar; in other words that the bank would take over the bonds, of the par value of $28,000, in exchange for the notes of the par value of $27,000, with the balance of the interest due thereon, subsequently found to amount to $240.00, to be paid by the defendants. The testimony also shows that Zimmerman did not immediately accept the offer to buy, telling Huie that he would let him know in a few days, for the purpose, apparently, of giving him time to investigate the market value of the bonds. In the meantime, the notes in suit had been made ready by Huie for execution. In fact that appears to have been true when Zimmerman went to the bank the first time. He took these notes with him; they were properly signed and taken to the bank, with the understanding that they should be returned if the sale above mentioned should be completed. It further appears from Zimmerman's direct examination that the sale was "consummated" a few days thereafter and that he told Huie that he was going to California and to complete the transaction with Guthlin, secretary of the two defendant companies. It is claimed that this testimony does not show an acceptance of the offer to buy the bonds. But whatever testimony was lacking in this respect, was supplied on cross-examina-

tion of Zimmerman. He testified, among other things, as follows:

"A. I agreed to sell them (the bonds) for the notes. Q. You let Mr. Huie know a few days after the notes were left there that you would sell the bonds? A. Yes sir. Q. And what did Mr. Huie say when you told him you would sell the bonds? A. He said all right, when I get the interest figured up and the coupons (on the bonds) back, I will settle with Mr. Guthlin."

On further cross-examination the witness testified:

"Q. Any agreement you made with Mr. Huie * * * * was an oral agreement by which you agreed to sell and the bank agreed to buy from you these bonds? A. Yes sir. Q. Agreement you would sell the bonds and that the bank would buy them from you? A. From me and the Douglas Securities Company, we gave the bonds for the notes."

This testimony, accordingly, discloses a clear offer and a definite acceptance. Mr. Guthlin, the secretary, as above mentioned, and agent for Mr. Zimmerman, testified that soon after the 15th of January, 1929, and after Mr. Zimmerman had gone to California he paid the item of $240 referred to above and that he called upon Mr. Huie for the renewal notes dated January 10, 1929, but that Mr. Huie told him that he was busy and that he would send them through the mail as soon as he could find time to do so; that he called upon Mr. Huie three or four times, but each time received about the same answer; that he also, at three different times demanded the notes from Rowley, vice-president of the bank, who, however, could not find them. This was, to a large extent, corroborated by Rowley himself. Dr. Hylton testified that on Feb-

ruary 20, 1929, Mr. Huie told him that he had bought the bonds in question. The witness had occasion to remember this by reason of the fact that he wanted Mr. Huie to buy from him some Casper improvement bonds in another district, which were controlled by the witness. In January, 1931, at a meeting of the stockholders of the First State Bank, Mr. Tierney, then president of the First State Bank, claimed that the bonds belonged to the bank, and about the same time an attempt was made by the bank to enforce payment of some of the bonds, some of which at that time were apparently in default. On May 7, 1929, the bank deposited the bonds in question with the treasurer of Converse County, Wyoming, to secure the deposits which the county had in the bank, guaranteeing the title thereto and vesting it in Converse County. It seems clear from the foregoing, even without considering the testimony of Dr. Hylton, that if the court credited the testimony heretofore set out it was sufficient to support the judgment herein. To make this clearer we shall give a brief review of the plaintiff's testimony.

Mr. Huie, as heretofore stated, was president and manager of the bank. He denied the transaction testified to by Zimmerman, as well as the testimony given by Dr. Hylton. The latter's testimony which is claimed to be incompetent, was admissible at least for the purpose of contradicting Huie. Some facts appeared which are so peculiar as to naturally cause the trial judge to wonder what the actual truth could be as to some phases of the case. The beginning of the transactions involved herein was in the month of June, 1926, when Zimmerman borrowed the sum of $3000 from the First State Bank on behalf of the Douglas Securities Company. This

and other loans made to the defendants were renewed from time to time, the last renewal being made on January 10, 1929, as above mentioned. Each time that a renewal note or an additional loan was made, some or all of the bonds in question were put up as collateral. All were so put up with the notes dated January 10, 1929. The notes given at various times, including those dated January 10, 1929, were never listed on the books of the bank and, so far as its records show, never became the property of the bank, but the bonds put up as collateral were listed on the books as the property of the bank. Mr. Huie testified that the notes were kept in a collateral file. In this, however, he was contradicted by Mr. Dalton, for several years chairman of the Board of Directors, who stated that he never found any notes of the defendants in any collateral file, and as already indicated, by Mr. Rowley, vice-president or cashier of the bank, who testified that Guthlin came to him soon after January 10, 1929, to look for the notes in suit; that he searched the bank records and the collateral files carefully but that the notes were not in the bank. Mr. Huie severed his connection with the bank early in July, 1929, on account of a nervous breakdown. His effects were sent to Alabama and subsequently to Detroit, Michigan. Among these effects were found the notes in suit. This was about October, 1930. Huie attempted to explain this by saying that on July 4, 1929, he had the notes out for the purpose of figuring up the interest thereon; that his nervous breakdown occurred at that time, and that some one inadvertently put the notes among his, Huie's, personal effects. On February 23, 1931, he sent the notes to Mr. Dalton who in turn took them to the State Examiner. In a letter written by Huie on March 21, 1931, to Dawson, then county

attorney of Converse County, he stated that the notes were taken as collateral to secure the Casper bonds in question. These bonds drew interest at the rate of 6 percent, while the notes in suit drew interest at 8 percent, making it, accordingly, improbable that the notes were collateral to the bonds instead of the reverse. Huie, a witness in the case, testified in part as follows:

"Q. In what books of the bank were these notes entered? A. They were not entered in any book in the bank. Q. Why not? A. For the simple reason that they were kept in a file, under the name of the makers of the note, in a collateral file. Q. Isn't it customary to enter notes that belong to a bank and that are supposed to be assets of a bank upon some book or register in the bank? A. It is customary with certain exceptions. Q. What exceptions does it come under? A. Notes held as collateral or additional security."

Here, accordingly, appears the same claim mentioned in the letter to Mr. Dawson, namely, that the notes were collateral to the bonds. Yet it is clear from the record in this case that this was not true, as shown by some of the testimony of Huie himself. He attempted to explain the peculiar fact that the bonds were entered as property of the bank by stating that he originally had an agreement in writing with Mr. Zimmerman that the bank should have the right to use the bonds as collateral to secure deposits of public money in the bank. He could not find that agreement and its execution was denied by Mr. Zimmerman. The trial court evidently disregarded the testimony of Mr. Huie. Taking into consideration the peculiar circumstances herein stated and the fact that Huie was contradicted in important points, the court was, we think, warranted in so doing. With Mr. Huie's testimony dis-

regarded, the assignment of error now under discussion has little support in the record.

Counsel for the plaintiff, however, lay stress upon the testimony of Mr. Tierney, who stated that at the meeting of the stockholders of the First State Bank in January, 1931, Mr. Guthlin, who was present, stated that the bonds were not the property of the bank. That testimony, however, stands alone. A number of witnesses testified to the statements then made by Guthlin, including the latter himself. They gave an entirely different version of the conversation, testifying that Guthlin merely asked whether or not the bonds were owned by the bank and that Mr. Tierney stated that they were. In view of the fact that during a period of two years the notes in suit had not been found, the question asked by Guthlin cannot be said to have been inconsistent with the claim of the defendants herein, but, on the contrary, seems to have been the natural consequence of the facts shown herein. Stress, too, is laid by counsel for the plaintiff upon the testimony of the witness Johnson, who stated that he had a talk with Zimmerman in the fall of 1929, in which Zimmerman claimed that the bonds in question belonged to him. This testimony was not contradicted. It should, of course, have been, if not true, or some explanation thereof should have been made. We must, however, remember that a great number of witnesses testified in this case. The record herein is long, and it may be that counsel for the defendants overlooked this testimony. The statement, if made, is in conflict with the testimony of Zimmerman relating to the sale of the bonds, so that it is altogether likely, had his attention been called to Johnson's testimony, that he would have contradicted it or would have given some explan-

ation. Johnson was an officer and director of the bank. Numerous efforts had been made to find the notes in suit, and it is possible that Zimmerman's statement, if made, constituted merely an indirect method of finding out the truth of the situation. In any event, taking the record as a whole, we cannot believe that the testimony given by Mr. Johnson should control this case. Stress is further laid by counsel for the plaintiff upon the fact that it 'is altogether unlikely that Huie as president of the bank would have bought the bonds in view of their value in 1929. But we find a conflict of testimony also on this point. Mr. Joyce, treasurer of Casper, testified that shortly before January 10, 1929, he made a survey of the value of the bonds in question; that he had come to the conclusion that from 25 to 30 per cent. of the bonds would never be paid; and that he kept Huie advised. The extent of his communications to Huie is not shown. Zimmerman testified that he was fully acquainted with the value of the bonds; that he made inquiries in January, 1929, both in Casper as well as in Denver, and that he then found that they were selling at approximately 95 or 96 on the hundred; that he considered the bonds in question worth 98 cents on the dollar at that time; that he believed the value at the time of the trial to be 90 cents on the dollar, or 75 cents on the dollar, as he stated in another place. The two statements are inconsistent and we cannot tell from the record which is correct. Furthermore, in the body of the notes given on January 10, 1929, the bonds put up as collateral were stated to be worth par; the notes were made out by Mr. Huie himself, and his insertion of that statement in the notes is not explained. Nor can we forget that in January, 1929, we were nearly at the peak of an

apparent but illusory prosperity. All property thereafter shrunk in value. Investments then considered good turned out in millions of cases to be poor, and we cannot, in view of what has been shown, say that the trial court was wrong in its conclusions herein. Counsel for the plaintiff argue that we have here a presumption of ownership, arising out of the fact that the bank has possession of the notes in suit at the time of the trial. 8 C. J. 1014. But in view of the peculiar situation, this presumption rests upon a weak foundation in the case at bar. The bank was not in possession of the notes for the period of two years or more. That fact strongly corroborates Zimmerman's claim, and the force thereof is not, we think, materially weakened by the subsequent possession of the bank, obtained as it was under peculiar circumstances. The court was not bound to accept Huie's explanation. We think, accordingly, that the assignment of error under discussion must be overruled.

2. Counsel for the plaintiff look upon the alleged sale of bonds as a transaction by which the notes in question were paid by something else than cash, namely, by the bonds in question, and it is contended that Huie had no authority to accept in payment anything else than money. It appears to be held by many of the courts that an officer of a bank has no power merely by virtue of his office to accept in payment of notes anything else than money. 3 R. C. L. 449; Farmers & Merchants Bank v. Bayer, 259 Ill. App. 31, and cases cited; Note 28 A. L. R. 666. On the other hand, it was held in Barnett v. Bank, 147 Ark. 500, 228 S. W. 369, that where a debtor owing notes to the bank delivered to the president other notes which were accepted as payment, the bank was bound thereby. It may be,

however, that it should not be presumed that a cashier or president has power, merely by virtue of his office, to accept in payment of an obligation anything but money. Hall v. First State Bank (Tex. Civ. App.) 4 S. W. (2d) 253; Michie, Banks & Banking, permanent edition 4, page 164. In the case at bar, Mr. Huie was more than merely president of the bank. He was its general manager, doing, as the testimony shows, *most* of its business, and whether or not such manager is limited by the power of a cashier or of a president presents a different question, for the powers of such manager are, ordinarily at least, broader than those of a merely executive officer. Metzger v. Bank, 98 Miss. 108, 54 So. 241, 14a C. J. 95. It is stated in Fletcher, Ency. of Corporations, Sec. 2098, as to such officer:

"The powers and duties of a general manager are sometimes, but not usually, defined by the charter or by-laws. If not so defined, then his powers are at least as broad and comprehensive as those of a general agent; and the general rule is that, in the absence of express restrictions on his powers, with actual or constructive notice thereof to persons dealing with him, an officer or agent of a corporation, intrusted with the general management and control of its business, has implied authority to make any contract or do any other act which is necessary or appropriate in the ordinary business of the corporation."

See also Thompson on Corporations (3rd Ed.), Sec. 1691.

Nor is it necessary, in order to have the powers of a general manager, that he be denominated as such, or that such an office or position exists; it is sufficient that the corporation permits him to conduct and manage the business without objection. Fletcher, supra, Sec. 2097. In any event, the ques-

tion is merely one of power. It makes little difference whether the transaction mentioned is considered as payment of the notes by the bonds, or as a purchase of the bonds in order to pay the notes with the proceeds. Full power to enter into the transaction could, in any event, be granted by the directors to Huie, and that either by implication or expressly. 14a C. J. 95; 7 R. C. L. 447; Northwestern Fuel & S. Co. v. Lee, 102 Wis. 426, 78 N. W. 584; McElroy v. Horse Co., 96 Wis. 317, 71 N. W. 652; Jones v. Williams, 139 Mo. 1, 25, 26, 39 S. W. 486, 40 S. W. 353, 37 L. R. A. 682, 61 Am. St. Rep. 436.

In Morawetz on Private Corporations, Sec. 538, the author says:

"There can be no doubt that the board of directors may invest the president with authority to act as chief executive officer of the company. This may be done either by an express resolution or by acquiescence in the course of dealing. A person dealing with the president of a corporation in the usual manner, and within the powers which the president has been accustomed to exercise without the dissent of the directors, would be entitled to assume that the president had actually been invested with those powers."

The bank in this case bought bonds from time to time. That seems to have been incident to the business transacted by the bank. There are circumstances in the record indicating that the board of directors had nothing to do with such purchases, but left all such transactions to Mr. Huie. The directors of a bank are chargeable with knowledge of its financial affairs, of which it is their duty to become informed. Farmer's State Bank v. Haun, 30 Wyo. 322, 349, 222 Pac. 45. And it would seem

clear that investments of a bank should come within that rule. If the directors in this case paid any adequate attention thereto, it is almost incredible that they did not know of the absence of the notes sued on herein. They had, as shown by the minutes of the board meetings, knowledge of at least part of the indebtedness of which the notes sued on herein were renewals. This fact, if they, instead of Huie, really managed the bank's affairs, would naturally cause them to inquire as to what had become of that indebtedness, and of the notes evidencing it, and any reasonable inquiry would inevitably have led to knowledge of the facts or to sufficient knowledge to cause them to make further inquiry, within a reasonable time, and thus discover the truth. Demand for the notes in suit was made of Rowley, vice-president or cashier of the bank. Even he was kept in such subordinate position that he did not know the truth. For two years or more, after January 1929, neither the directors nor anyone else made any claim that the bonds in question were in the bank merely as collateral. In fact the directors seem to have had so little knowledge of the affairs of the bank that they apparently did not know that prior to January 10, 1929, and for nearly three years, the bonds in question were in the bank merely as collateral; at least they did not take the trouble of finding out whether the notes of defendants were in the bank. That may be inferred from the testimony of Mr. Dalton, chairman of the loan committee. In view of all the facts in the case, it would seem that the trial court was warranted in finding that the bank was managed almost exclusively by Huie, by and with the consent of the board of directors; that transactions like that in the case at bar were left to him, and that the bank, accordingly, at this late date, should not be permitted to

question his authority. And that is not all. The bank transferred the bonds herein mentioned, as already stated, to Converse County to secure public deposits, guaranteeing the title thereto. It accepted the benefits thus accruing to it by reason of the transaction in question, and the court was warranted in finding that it was, accordingly, estopped at this time to claim want of authority in Mr. Huie. First Nat. Bank v. Bryan, 215 Ky. 338, 285 S. W. 239; 7 R. C. L. 665; Michie, supra, 4, page 210. In Commissioner of Banks v. Trust Company, 259 Mass. 162, 156 N. E. 7, 15, the court, in considering the power of the president of the trust company to purchase stock in another trust company without consulting his board of directors, said as follows:

"While his office as such conferred upon him no authority to purchase the stock on behalf of the corporations, such act of his was not illegal in the sense that it was violative of the common or statutory law. His acts, in excess of his authority, although voidable by the corporation, legally could be ratified and adopted by it, and the acceptance of dividends furnishes a reasonable inference that this was done. * * * * The defendant could not accept the benefits of the executed contract and thereafter void it on the ground that it was ultra vires or because it was beyond any power conferred by the defendant upon its president."

3. It is further argued that the transaction was within the statute of frauds, since section 98-202, R. S. 1931, provides that a contract for the sale of personal property of the value of $50 or more shall be unenforceable unless there is either an acceptance and actual receipt by the purchaser of the goods or a part of them, or a part payment, or a written memorandum signed by the party to be charged. This point need not detain us long. There was, it

is true, no written memorandum, and it is contended that there was no acceptance, in view of the fact that the bank had the bonds already in its possession when the contract of sale was made. Many authorities are cited that when the property sold is already in the buyer's possession, something else must appear in order to constitute an acceptance. The rule is thus stated in 27 C. J. 247:

"The fact that the property which is the subject of the contract of sale is already in the buyer's possession does not alone constitute an acceptance; but there must be some further manifestation of an approval of the property as fulfilling the contract. Evidence showing acts of dominion and control thereover by the buyer inconsistent with the facts upon which his prior possession was based will be sufficient. Mere declarations of ownership, on the part of the buyer, will suffice, this being an exception to the general rule that acceptance must be shown by acts, and not words. The conversion and sale by a buyer of property in his possession under an oral contract of sale constitutes such an acceptance as will take the contract out of the statute."

In this case there were declarations of ownership, subsequent to the transaction. We need not pass upon the question as to whether the statement made by Huie to Dr. Hylton was admissible for that purpose. Declarations of ownership were made by Tierney in the presence of the stockholders. Acts of ownership were exercised by the bank by an attempt to enforce payment of some of the bonds, not because it held the bonds as security to notes, but as owners. Furthermore, we may again refer to the fact that the bonds were delivered to Converse County as the bank's property, and the title thereto was guaranteed. That constituted a conversion thereof, if the bank did not own them, unless Huie's

claim that the defendants granted that right to the bank in 1926 is correct. But as already stated, the trial court rejected the testimony to that effect and we cannot say that this was error. Counsel further argue that the testimony is undisputed to the effect that the bank used the bonds for a similar purpose prior to January, 1929. They refer to Huie's testimony. But counsel have evidently misinterpreted it. Huie was twice asked whether or not the bonds had been so used by the bank, and twice he answered that he could not swear that to be true. It may be that counsel refer to such use prior to 1926—that is to say, to a time when the bank was in fact the owner of the bonds. But what was done during such time cannot affect the situation here. The bank ceased to be owner sometime during 1925, and there is no evidence of such use from that time on until May, 1929, after the bonds had again become the property of the bank.

The judgment of the trial court must, accordingly, be affirmed, and it is so ordered.

*Affirmed.*

KIMBALL, Ch. J., and RINER, J., concur.